18-2454-cv (L)
*People of the State of New York v. Griepp*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2019

(Argued: September 26, 2019      Decided: March 10, 2021)

Docket Nos. 18-2454-cv, 18-2623-cv, 18-2627-cv, 18-2630-cv

_____

PEOPLE OF THE STATE OF NEW YORK by
LETITIA JAMES, Attorney General of the State of New York,

*Plaintiff-Appellant—Cross-Appellee,*

v.

KENNETH GRIEPP, RONALD GEORGE, PATRICIA MUSCO,
RANVILLE THOMAS, OSAYINWENSE OKUONGHAE,
ANNE KAMINSKY, BRIAN GEORGE, SHARON RICHARDS,
DEBORAH M. RYAN, ANGELA BRAXTON,
JASMINE LALANDE, PRISCA JOSEPH, SCOTT FITCHETT, JR.,

*Defendants-Appellees—Cross-Appellants.*[1]

_____

---

[1] The Clerk of Court is directed to amend the caption as above.

Before: LIVINGSTON, *Chief Judge*, CALABRESI, and POOLER, *Circuit Judges*.

Appeal from the order of the United States District Court for the Eastern District of New York (Carol Bagley Amon, *J.*) denying Appellant Attorney General of the State of New York ("OAG") a preliminary injunction against Defendants Kenneth Griepp, Ronald George, Patricia Musco, Ranville Thomas, Osayinwense Okuonghae, Anne Kaminsky, Brian George, Sharon Richards, Deborah Ryan, Prisca Joseph, Angela Braxton, Jasmine LaLande, and Scott Fitchett, Jr. (collectively "Defendants") relating to their protest activities in violation of the federal Freedom of Access to Clinic Entrances Act ("FACE"), 18 U.S.C. § 248(a)(1), (c)(3)(A); the New York Clinic Access Act ("NYSCAA"), N.Y. Penal Law § 240.70(1)(a)-(b); and the New York City Clinic Access Act ("the City Act"), N.Y.C. Admin. Code §§ 10-1003(a)(1)-(4), 10-1004.

Cross-appeal from the order of the United States District Court for the Eastern District of New York (Carol Bagley Amon, *J.*) denying the OAG a preliminary injunction. Defendants—Cross-Appellants challenge the district court's conclusion that FACE and its analogs are not facially unconstitutional and argue that the City Act's follow-and-harass and clinic-interference provisions are void for vagueness. Defendants—Cross-Appellants further

2

challenge the district court's conclusions that the OAG has parens patriae standing to sue under the City Act and that defendant B. George violated FACE, NYSCAA, and the City Act by physically obstructing patients.

VACATED and REMANDED in part and AFFIRMED in part. Judge Calabresi joins in Judge Pooler's opinion for the Court and also concurs by a separate opinion. Chief Judge Livingston concurs in part and dissents in part in a separate opinion.

_____

ESTER MURDUKHAYEVA, Assistant Solicitor General (Steven C. Wu, Deputy Solicitor General, *on the brief*), *for* Barbara D. Underwood, Solicitor General of the State of New York, *for* Letitia James, Attorney General of the State of New York, New York, NY, *for Plaintiff-Appellant—Cross-Appellee*.

MARTIN A. CANNON, Thomas More Society, Crescent, IA, *for Defendants-Appellees—Cross-Appellants Kenneth Griepp, Ronald George, Patricia Musco, Ranville Thomas, Osayinwense Okuonghae, Anne Kaminsky, Brian George, Sharon Richards, Deborah M. Ryan, Prisca Joseph*.

RICHARD THOMPSON (Kate Oliveri, *on the brief*), Thomas More Law Center, Ann Arbor, MI, *for Defendants-Appellees—Cross-Appellants Angela Braxton, Jasmine LaLande*.

Horatio G. Mihet and Roger K. Gannam, Liberty Counsel, Orlando, FL, *for Defendant-Appellee—Cross-Appellant Scott Fitchett, Jr.*

Richard Dearing, Aaron Bloom, Eva Jerome, Assistant Corporation Counsel, *for* Zachary W. Carter, Corporation Counsel of the City of New York, New York, NY, *amicus curiae in support of Plaintiffs-Appellants—Cross-Appellees People of the State of New York.*

Erin Beth Harrist, Arthur Eisenberg, New York Civil Liberties Union, New York, NY, *amicus curiae in support of Plaintiffs-Appellants—Cross-Appellees People of the State of New York.*

POOLER, *Circuit Judge*:

Courts face unique difficulties when conflicting constitutional rights are at stake. The right to protest is a fundamental right central to the First Amendment. The right to be free from harassment and threats from protestors is an equally fundamental right. Properly protecting both sets of rights presents some of the most challenging work courts are called upon to do.

Helpfully, decisions of the legislature sometimes guide us in conducting this delicate balancing task. With respect to protests outside reproductive health clinics, Congress, the State of New York, and New York City have enacted laws that delineate the line between appropriate protest activities and those that

4

infringe improperly on the right of those attempting to access the clinic. This case requires us to define the scope of the federal Freedom of Access to Clinic Entrances ("FACE") Act and its state and local counterparts.

Every Saturday morning in Queens, New York, anti-abortion groups have protested outside Choices Medical Center, a reproductive health care facility offering a myriad of reproductive health services, including abortions. The protestors contend that their efforts walk up to, but do not cross, the legal boundary. These protestors employ tactics like "do[ing] the slow walk in front of the clients so [other protestors] can talk to [those patients]," because it "gives [them] a little more time to plead for the baby's life," App'x at 1860; "tag teaming" patients so that, even after a patient has asked the protestor to leave her alone, another protestor will approach the patient, App'x at 1750; or using signs as a "barrier" by the clinic entrance on a city sidewalk, App'x at 1881.

After a yearlong investigation into the protestor activity outside Choices, the New York Office of the Attorney General ("OAG") brought suit and sought a preliminary injunction against certain protestors, including Defendants Kenneth Griepp, Ronald George, Patricia Musco, Ranville Thomas, Osayinwense Okuonghae, Anne Kaminsky, Brian George, Sharon Richards, Deborah Ryan,

5

Prisca Joseph, Angela Braxton, Jasmine LaLande, and Scott Fitchett, Jr. (collectively "Defendants") relating to their protest activities in violation of the federal Freedom of Access to Clinic Entrances Act ("FACE"), 18 U.S.C. § 248(a)(1), (c)(3)(A); the New York Clinic Access Act ("NYSCAA"), N.Y. Penal Law § 240.70(1)(a)-(b); and the New York City Clinic Access Act ("the City Act"), N.Y.C. Admin. Code §§ 10-1003(a)(1)-(4), 10-1004.

In its denial of the preliminary injunction, which the OAG appeals before us today, the district court concluded that Defendants' conduct was too minor to constitute violations of FACE and its state and local analogs. It characterized the challenged protestor activity as merely "incidental contact," causing only "slight[]" deviations or delays, or otherwise being too negligible to interfere with patients' rights. *New York by Underwood v. Griepp*, No. 17-CV-3706, 2018 WL 3518527, at \*33, \*44 (E.D.N.Y. July 20, 2018).

We cannot completely agree with the district court's conclusions. FACE is by its own terms broad. Writing in restrictions to narrow its reach, in contravention of its text and purpose, would effectively eviscerate the statute. Because we determine that the district court made certain improper evidentiary and credibility rulings, relied on clearly erroneous factual findings in assessing

6

the OAG's physical obstruction claims, erred in its interpretation of the FACE statute and its state and local analogs, and abused its discretion in finding no irreparable harm, we vacate and remand in part.[2] We affirm as to the remainder.

Defendants also cross-appeal from the same order denying the preliminary injunction. Defendants challenge the following conclusions of the district court: (1) Defendant Brian George violated FACE, NYSCAA, and the City Act by physically obstructing patients; (2) the statutes do not violate the First Amendment; and (3) the OAG has parens patriae standing to sue under the City Act. We affirm the district court's conclusions on these issues.

## BACKGROUND

## I.    Choices Medical Center

Choices Medical Center ("Choices") is an ambulatory outpatient medical center that provides extensive reproductive health services in Jamaica, Queens,

---

[2] As we have noted before, "abuse of discretion is a nonpejorative term of art; it implies no misconduct on the part of the district court. The term merely describes circumstances in which a district court bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or renders a decision that cannot be located within the range of permissible decisions." *United States v. Hendricks*, 921 F.3d 320, 328 n.37 (2d Cir. 2019) (internal citations, brackets, and quotation marks omitted). In using the term "abuse of discretion" in this opinion, we therefore mean no slight to the able district court in this case.

New York. Choices provides medical services such as abortions, prenatal care, colposcopy, and obstetrics and gynecological services, among others. The main entrance is located on 147th Place between Jamaica and Archer Avenues, but there is also an employee entrance on 148th Street between Jamaica and Archer Avenues and a patient exit on Jamaica Avenue between 147th Place and 148th Street. Most patients arrive by foot and enter through the main entrance. Other patients arrive by cars, which drop them off on 147th Place next to the main entrance.

Every Saturday morning since the clinic first opened in 2012, people have protested outside the main entrance. While some protestors are independent individuals, most are affiliated with organized groups such as Church at the Rock or Grace Baptist Church.[3] Protestors from Church at the Rock are typically assigned roles including preaching, sidewalk counseling, handing out literature, or holding large signs.

---

[3] Defendants Kenneth Griepp, Ronald George, Patricia Musco, Ranville Thomas, Osayinwense Okuonghae, Anne Kaminsky, Brian George, Sharon Richards, Deborah Ryan, and Prisca Joseph are affiliated with the Church at the Rock. Defendants Angela Braxton and Jasmine LaLande are protestors from Grace Baptist Church. Defendant Scott Fitchett, Jr. is an independent protestor.

As a response to the protest activity, Choices started a program by which volunteer "escorts" greet and walk patients down the sidewalk to the main entrance when protestors are present. These escorts arrive on Saturday mornings and are present from the clinic's opening at 7:00 am until the protestors' departure at approximately 10:00 am. To assist patients walking toward the entrance and past the protestors, the escorts at times use their bodies to shield the protestors, either by standing at the sides of patients or by walking in front of or behind patients. Escorts also sometimes hold out their arms to maintain distance between patients and protestors or stand in front of protestors' signs to block their visibility. On an average Saturday morning, there are two to three dozen protestors and escorts.

**II.    The Attorney General's Investigation**

In June 2016, the OAG began a year-long investigation into the protest activity outside Choices. As part of its investigation, it installed a high-mounted surveillance camera to capture the 147th Place entrance, and it also used undercover investigators with hidden cameras to pose as patients and their

9

companions. Two escort leaders,[4] Pearl Brady and Theresa White, aided the investigation by wearing hidden cameras on a few occasions.

**III.     Procedural History**

**A. Preliminary Injunction Hearing**

On June 20, 2017, the OAG, on behalf of the State of New York as parens patriae, sued thirteen protestors for purported violations of FACE, 18 U.S.C. § 248(a)(1), (c)(3)(A); the NYSCAA, N.Y. Penal Law § 240.70(1)(a)-(b); and the City Act, N.Y.C. Admin. Code §§ 10-1003(a)(1)-(4), 10-1004. In broad strokes, the OAG alleged that Defendants violated these laws by crowding patients and escorts with their bodies and signs, leaning into cars to provide literature or counseling, making threatening statements, and attempting to engage patients and escorts despite clear rebuffs. The OAG also filed a motion for a preliminary injunction the same day it filed its complaint. Shortly thereafter, Defendants filed motions to dismiss and opposed the motion for a preliminary injunction.

---

[4] The escort program at Choices included volunteer escorts, who receive no compensation, and escort leaders, who receive reimbursement from Choices for travel to and from the clinic. Escort leaders are responsible for the volunteers.

The parties agreed to expedite discovery and proceed to a preliminary injunction hearing that, though trial-like, would not fully resolve the case. The hearing spanned fourteen days. The district court held oral argument on the motion approximately two and one-half months later. At the hearing, the parties introduced three types of evidence: documentary evidence, video and photographic evidence, and oral testimony from seven plaintiff's witnesses and ten defendants' witnesses.

The documentary evidence consisted of two types of records kept by the clinic: Clinic Escort Recaps ("Recaps") and Protestor Experience Questionnaires ("PEQs"). The Recaps provide an overview of the day's events and any noteworthy incidents. Various escorts or escort leaders draft the Recaps, but the author of a given Recap is only sometimes apparent from the face of the document. The PEQs are filled out by patients after entering the clinic and are meant to collect information from the patients' perspectives as to whether they encountered protestors, and if so, whether the protestors touched them or tried to prevent them from accessing the clinic's entrance. The PEQs included both yes/no questions and open-ended ones.

The defense's witnesses were primarily Defendants themselves, and the OAG's witnesses were escorts or other Choices employees. Pearl Brady, Margot Garnick, and Theresa White were current or former escort leaders at Choices. Mary Lou Greenberg was an independent contractor for Choices who worked on community outreach and directed the escort program. Troyd Asmus was a security guard at Choices from January 2013 to August 2016; in that role, he monitored video surveillance footage in real time and patrolled the surrounding area. Esther Priegue and Angelica Din were clinic staffers.

**B. The District Court's Decision**

On July 20, 2018, the district court denied the OAG's motion for a preliminary injunction.

In its order, the district court assigned various degrees of weight to the evidence introduced at the hearing. It accorded significant weight to the video and photographic evidence. It found the defense's witnesses and plaintiff's witnesses Priegue and Din credible, but it found plaintiff's witnesses Brady, Greenberg, Garnick, White, and Asmus not entirely credible based on their demeanor while testifying, among other reasons. Escort Brady was considered not credible because advice she gave to her fellow escorts on how to testify

12

demonstrated questionable candor and because the district court identified inconsistencies between her descriptions of protestor conduct during testimony and the depictions of that conduct in videos or photographs. Escort program director Greenberg was not entirely reliable because of her inability to recall certain details, her tendency to exaggerate protestor misconduct and omit mitigating details, and inconsistencies between her testimony and the video or photographic evidence. Escort Garnick was also not considered entirely credible because of her tendency to exaggerate protestor misconduct and inconsistencies between her testimony and the other evidence. Escort White was found to be not entirely credible because of her inability to recall events with accuracy, her faulty memory and eyesight, and her exaggerations of protestor misconduct. Finally, Choices security guard Asmus was unable to recall certain details with specificity and admittedly exaggerated the impropriety of protestor conduct, so he was deemed not fully reliable.

Regarding the documentary evidence, the district court gave no weight to the Recaps and PEQs. It furnished the following reasons for doing so. First, the documents were hearsay, and because of the procedural posture of the case, the district court believed there was no need to grant any weight to hearsay. Second,

the district court claimed that the Recaps exaggerated protestor misconduct.

Finally, the district court did not consider the PEQs because their representative value was impossible to ascertain in light of the fact that escort program director Greenberg had destroyed a number of PEQs without a system guiding her retention and destruction decisions.

Based on the remaining credible evidence, the district court held that the OAG failed to establish a likelihood of success on the merits for all but three of its FACE, NYSCAA, and City Act claims. For each claimed violation, the district court reviewed the video and photographic exhibits the OAG cited and provided its rationale as to why each exhibit was insufficient to demonstrate a violation. As a summary of its overarching conclusions, the district court said that the exhibits did not establish the requisite intent and at most showed only de minimis delays caused by the protestors.[5]

The sole challenged act that was ultimately held to be a violation was defendant B. George's "slow walk," a tactic B. George used to delay patients and their companions to provide more time for anti-abortion counseling. *Griepp*, 2018

---

[5] We discuss the district court's specific analysis and rationale for each exhibit in our discussion of the claims, *infra*.

WL 3518527, at *42. The district court also assumed, but did not decide, that defendants Kaminsky and Musco violated the City Act when, on one occasion each, they misled patients into believing the clinic was closed when it was in fact open. Nonetheless, the district court denied the injunction because there was no showing that irreparable harm was "actual and imminent" or that there was "a reasonable likelihood that the wrong will be repeated." *Id.* at *48 (internal quotation marks omitted); *see also id.* at *42. It relied on B. George's affidavit, which stated that he had only engaged in the slow walk on a few occasions before and "will not engage in that behavior again." *Griepp*, 2018 WL 3518527, at *42 (quoting B. George's affidavit). As for Kaminsky and Musco, the court relied on the fact that each had misled patients only once and had been warned against doing so by the court.

In the same July 20, 2018 order, the district court rejected the claims contained in Defendants' motions to dismiss. Namely, it held that the statutes did not violate the First Amendment and that the OAG had parens patriae standing to sue under the City Act. It did not decide Defendants' vagueness challenge to the City Act's follow-and-harass provision.

Both parties timely appealed.

15

**DISCUSSION**

The issues presented to us by the appeal are: (1) whether the district court erred in finding not reliable all the OAG's documentary evidence and the bulk of its testimonial evidence; (2) whether the OAG demonstrated a likelihood of success on the merits of its FACE, NYSCAA, and City Act claims; and (3) whether the OAG demonstrated irreparable harm.

The issues presented by the cross-appeal are: (1) whether FACE, NYSCAA, and the City Act are facially constitutional; (2) whether the OAG has parens patriae standing to sue under the City Act; and (3) whether defendant B. George impermissibly engaged in physical obstruction by using a slow walk to delay patients accessing the facility.

## I. Evidentiary Rulings

We review a lower court's credibility determinations for clear error. *United States v. Monzon*, 359 F.3d 110, 119 (2d Cir. 2004). Although this standard is deferential, we have reversed credibility determinations in some instances, such as when the credibility assessment cannot be reconciled with other evidence, when the district court incorrectly assessed the probative value of pieces of evidence, when it relied on speculation, or when the determinations were

16

"founded on factual inferences that the evidence did not permit." *Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004).

The OAG challenges the district court's failure to give any weight to the Recaps and PEQs along with its adverse credibility determinations regarding five of its witnesses. We address each in turn.

**A. Documentary Evidence**

The district court did not assign any weight to the documentary evidence—the Recaps and the PEQs—for three reasons: (1) the evidence was hearsay, and because the parties had conducted discovery and presented live testimony, there was no need to consider hearsay; (2) the Recaps, according to the district court, tended to exaggerate the impropriety of protestor conduct; and (3) because escort program director Greenberg destroyed a number of the PEQs without having a system guiding her process, the PEQs' representative value was not ascertainable. We conclude that none of these is a valid basis upon which to categorically reject the evidence. Therefore, failing to consider the Recaps and PEQs was clear error.

In reaching this conclusion, we emphasize that the district court's categorical exclusion of this admissible evidence is the error. The dissent takes

17

issue with what it perceives to be an imposition of our credibility determination in the place of the district court's, interpreting our decision as requiring the district court to accept the Recaps and PEQs as entirely credible.[6] We do no such thing. We instead rely on applicable precedent instructing us that categorical exclusion of this evidence was error.

### 1. Hearsay

As the district court correctly noted, hearsay evidence is admissible in a preliminary injunction hearing. *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010). But while the district court properly admitted the Recaps and PEQs, it erred in concluding that the Recaps and PEQs categorically "deserve[d] no weight" because, having completed discovery and taken live testimony from seventeen witnesses, "the urgency usually supporting the use of hearsay testimony in this setting" was missing. *Griepp*, 2018 WL 3518527, at *5.

In *Mullins*, we explained that rejecting hearsay evidence at the preliminary injunction stage "would be at odds with the summary nature of the remedy and

---

[6] As the partial dissent notes, there are many points on which the entire panel agrees. I refer to this partial dissent and partial concurrence as "the dissent" for ease of reading.

would undermine the ability of courts to provide timely provisional relief." 626 F.3d at 52. Excluding documents exclusively because they are hearsay in a preliminary injunction hearing is thus at odds with our precedent. This is true regardless of whether testimony has been taken or discovery completed. Indeed, in *Mullins* itself, discovery had concluded and depositions had been taken. *Id*. at 50-51. The district court here was permitted, under *Mullins*, to admit hearsay despite the somewhat unusual procedural posture at hand.

Citing to *Mullins*, *see Griepp*, 2018 WL 3518527, at *5, the district court correctly admitted the Recaps and PEQs, but it erred in categorically giving them *no* weight. We recognize that a trier of fact has considerable discretion in weighing the evidence before it. But the district court's reason for ignoring the documentary evidence here—that this evidence was both unnecessary and inherently unreliable—functionally contravenes the principle we articulated in *Mullins*, that "[t]he admissibility of hearsay . . . goes to weight, not preclusion, at the preliminary injunction stage." 626 F.3d at 52. Categorically giving no weight to the Recaps and PEQs on this basis was therefore erroneous. *See Bradford Tr. Co. of Bos. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 805 F.2d 49, 55 (2d Cir. 1986) (explaining that the district court's decision to ignore evidence properly admitted

19

under the public records exception because it was hearsay "is inconsistent with the notion of having exceptions to the hearsay rule[;] [c]onsequently, it was error for the trial court after admitting the FBI reports to accord them no weight").[7]

Thus, the district court's categorical exclusion of the documentary evidence cannot be supported by the hearsay nature of the evidence. We now turn to the district court's additional justifications.

### 2. Escort Recaps

Notwithstanding the deference we give to a district court's credibility determinations, we conclude that the district court clearly erred in giving no weight to the Recaps as a category. The district court chose not to give weight to these documents because "they tend to exaggerate the impropriety of protestor conduct and generally fail to provide . . . context." *Griepp*, 2018 WL 3518527, at *5. Yet the court only referenced one Recap with an apparent inconsistency to support this sweeping characterization.

---

[7] The dissent argues that the facts and circumstances of a given case should dictate a district court's approach to assigning weight to hearsay evidence. We do not disagree with that principle. But, as we make clear below, it was the district court's blanket approach to discrediting the Recaps and PEQs—largely because they constituted hearsay—that did not account for the facts and circumstances of the present case.

Even if the district court had grounds to assign little evidentiary weight to that particular Recap on credibility grounds, it was inappropriate to dismiss *every* Recap based on exaggeration in one. Each Recap described different incidents from different shifts, based on the recollections of distinct groups of volunteer escorts. Therefore, even if a few authors exaggerated, the exaggeration in one or two Recaps may not necessarily appear in others. The district court's categorical exclusion of all Recaps based on one of them assumes that all these documents share the identified infirmities—but this is a factual inference the evidence does not permit.

Nor is there valid reason to believe that *all* escorts tend to exaggerate. The district court suggested that the escorts were biased because of their views. Defendants no less than escorts have firm convictions about abortion—but Defendants were nevertheless considered credible. This alone, then, cannot support a finding of bias. Without more to corroborate such a finding as to *all* escorts who contributed to the Recaps, the categorical exclusion of these documents lacks the necessary support.

Defendants point to an additional Recap to suggest the Recaps are unreliable. The Recap notes that defendant Musco "used both hands to push

escorts who were blocking her access to a patient near the entrance." App'x at 2318. Defendants argue that, during the hearing, escort Garnick admitted the Recap was inaccurate after viewing a video clip. That is not so. Garnick testified that the shoving incident "isn't [in the clip]. However, prior to that was what I believe I testified to." App'x at 1426. We fail to see how this is an inconsistency.

Even if there were an additional incorrect Recap, two unreliable documents still would not justify categorical exclusion. Given the variation in authorship, there is simply no logical basis to suggest all Recaps are similarly defective. As a sister circuit has noted, because of the substantial risk that they are arbitrary and overbroad, such blanket evidentiary rulings are strongly disfavored. *See Cerabio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 994 (7th Cir. 2005). Rather, the district court should have considered the evidence individually. *Id*. By instead categorically rejecting all Recaps based on its concerns about one of those documents, the district court abused its discretion.

### 3. Protestor Experience Questionnaires

Giving no weight to the PEQs because of concerns over the PEQs' representative value was also clear error. The district court concluded that the "representative value" of the PEQs was "impossible to ascertain" because "only

22

a sample" was presented to the court and because escort program director Greenberg destroyed many of them. *Griepp*, 2018 WL 3518527, at *6.[8] The PEQs' representative value is immaterial. The OAG sought to use the PEQs as additional evidence of *specific* instances of protestor misconduct. The OAG did not offer the PEQs for their representative value, but instead as further evidence of specific instances of protestor misconduct. Accordingly, the failure to consider the PEQs on this basis constitutes clear error.

### 4. Harmless Error

Having concluded that the district court's evidentiary decisions were erroneous, we turn to the question of whether categorically excluding these documents was harmless.[9] If so, we cannot vacate the judgment on these grounds. *See* Fed. R. Civ. P. 61. An error is harmless if there is no "likelihood that the error affected the outcome of the case." *Kogut v. County of Nassau*, 789 F.3d 36, 47 (2d Cir. 2015) (citation and internal quotation marks omitted). However, this

---

[8] Greenberg explained that she did not retain PEQs where patients did not include a name because they did not want to be contacted about the incident or where the PEQ indicated that no incident had occurred.

[9] At our request, the parties submitted additional briefing on whether the district court's decision to assign no evidentiary weight to the PEQs and Recaps constituted harmless error.

23

does not mean that the evidence would necessarily ensure a different outcome. "In evaluating the effect of an error on a particular judgment, we are mindful that an appellate court deals only with probabilities, rather than certainties." *Hawkins v. LeFevre*, 758 F.2d 866, 877 (2d Cir. 1985); *see also Kotteakos v. United States*, 328 U.S. 750, 765 (1946) ("The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the [result] cannot stand.").

We do not believe the errors in this case are harmless. Rather, our review suggests that consideration of the Recaps likely would alter the outcome of the proceedings below. On the OAG's likelihood of success on the merits, the Recaps provide additional evidence of violations. For instance, one Recap indicates that defendant Richards stepped on and broke a patient's flip-flop as the patient approached the Clinic, such that the patient was left barefoot. *See* App'x at 2321 (Ex. 238-52). This could, in our view, support a physical obstruction claim. In addition, the Recaps could have affected the outcome of the OAG's force claims. While the OAG attempted to demonstrate use of force through Recaps, the district court did not consider these and considered only one incident for which

24

there was video surveillance. But the Recaps recount other incidents of force that could constitute violations. *See, e.g.*, App'x at 2254 (Ex. 210). Had the district court considered this evidence, the OAG might have succeeded in showing that Defendants wrongfully used force. Furthermore, the Recaps also contain evidence relevant to the OAG's follow-and-harass claims. *See, e.g.*, App'x at 2252 (Ex. 206), 2255 (Ex. 211).

The Recaps likely also would have affected the district court's conclusion that there was no irreparable harm. The district court found no likelihood that defendant B. George would engage in his slow walk delay tactic based on his affidavit, which stated that he had only done so "[o]n a handful of occasions in early 2017." App'x at 2187. Yet a Recap from June 2017 notes that B. George had engaged in his "slow-walk block" and blocked patients several times that day. App'x at 2324 (Ex. 238-56). This Recap thus calls into question the reliability of the central evidence supporting the district court's conclusion on irreparable harm.

Defendants respond that there was no prejudice in failing to give the Recaps any weight because the OAG was able to elicit testimony of the events contained in the Recaps. We cannot agree.

25

Even if the evidence was duplicative in content, the difference lies in the credibility of each source. While the witnesses were considered not entirely credible, as discussed above, we see no reason to categorically conclude that the Recaps were similarly unreliable. As such, the district court's decision to give no weight to the Recaps was prejudicial in that it prevented the OAG from being able to show credible evidentiary support for those alleged violations that were not captured in the photographic or video evidence. We therefore conclude that, to the extent the Recaps contain evidence relevant to finding violations of the statutes at issue here, "preclusion of the evidence deprived [the OAG] of a full hearing on the issue[s] . . . and was, therefore, not harmless error." *Glass v. Phila. Elec. Co.*, 34 F.3d 188, 195 (3d Cir. 1994).

We reach a different conclusion with respect to the PEQs. The PEQs contain significantly less information than the Recaps. Most importantly, the PEQs do not identify any defendant by name. Accordingly, they could not be used for the purpose of demonstrating additional violations. The OAG argues that the PEQs are relevant because they show victims' reactions to protestor conduct, and that they thus "strongly undermine the district court's conclusion that the Attorney General's witnesses exaggerated defendants' misconduct."

26

Appellant's Supp. Br. at 10. But as we discuss more fully below, the district court's credibility determinations were based on comparisons between witness testimony and video evidence. The PEQs do not speak to these instances.[10] For these reasons, we conclude that the district court's failure to consider the PEQs, unlike its failure to consider the Recaps, was harmless error.

**B. Plaintiff's Witnesses**

**1. Pearl Brady**

As to the adverse credibility determinations of plaintiff's witnesses, we do not believe that the district court clearly erred in finding these witnesses not completely credible. We begin our discussion with escort Pearl Brady. The district court provided two reasons for why it questioned Brady's credibility: (1) Brady's "questionable candor as reflected by her advice to colleagues as to how to testify," and (2) "inconsistencies between her descriptions of protestor conduct and the conduct shown in the supporting videos and photographs." *Griepp*, 2018

---

[10] Any attempt to generalize from the PEQs must fail because, as the district court concluded, the representative value of the PEQs is not apparent from the record, a conclusion the OAG does not challenge.

27

WL 3518527, at *6. We agree with the district court's reliance on the second, but not the first, rationale.

We do not believe the advice escort Brady gave to her colleagues demonstrates "questionable candor." *Id.* In a group chat with other escorts, Brady says while discussing upcoming depositions, "Just remember: yes, no, I don't know, I don't remember, and I don't understand the question. Short answers. Don't elaborate. This is for them to get more information, and it's our job to give them as little help as possible." App'x at 3376. This is fairly standard advice. Indeed, attorneys often tell their clients just what Brady tells her colleagues in the chat: Say only what is necessary to answer the question and no more. *See* Restatement (Third) of the Law Governing Lawyers § 116 (Am. Law Inst. 2000). Nowhere in the chat does Brady encourage her fellow escorts to make misrepresentations or otherwise act dishonestly. Such routine advice does not support questioning Brady's sincerity.

Nonetheless, we affirm the district court's credibility determination based on the inconsistencies it identified between Exhibit 31 and escort Brady's testimony. With regard to Exhibit 31, Brady testified that defendant R. George "picked [his sign] up and when the escorts were trying to walk toward an

28

arriving patient he put the sign down to block their access, which he did twice. And then he stopped in the middle of the sidewalk and the patients had to go around—the patient and the companion had to go around him in order to get into the clinic." App'x at 447. According to the district court's interpretation of the video, however, the escorts "were not 'trying to walk toward an arriving patient' at all; they were only trying to step in front of R. George's sign to block it from sight." *Griepp*, 2018 WL 3518527, at *11 (record citation omitted) (quoting App'x at 447).

It is well established in our Circuit that inconsistencies between a witness's testimony and other evidence in the record can support a district court's adverse credibility determination. *See Doe v. Menefee*, 391 F.3d 147, 164 (2d Cir. 2004). This is true even when, as here, the witness's account was equally plausible. *See id*.

It would be another matter if the district court's interpretation of the video evidence were clearly erroneous. But given the deferential standard of review and other evidence in the record supporting the district court's interpretation, *see* Ex. K-14 (depicting escort Brady moving in a manner like the escorts in Exhibit 31 while attempting to block a protestor's sign), we cannot say that the district court clearly erred in interpreting Exhibit 31. *See also Anderson v. City of Bessemer*

29

*City*, 470 U.S. 564, 574 (1985) (noting that a district court's decision to credit one of two equally plausible views of the evidence is not clear error).

Therefore, while escort Brady's advice to her fellow escorts on testifying cannot support the district court's adverse credibility determination of Brady, the inconsistency identified between Exhibit 31 and Brady's testimony can. For this reason, we affirm the district court's finding that Brady was not entirely credible.

## 2. Mary Lou Greenberg, Margot Garnick, Theresa White, and Troyd Asmus

We further decline to disturb the district court's credibility findings as to plaintiff's witnesses Greenberg, Garnick, White, and Asmus. The record sufficiently supports the district court's findings. The district court found escort program director Greenberg not entirely credible based on Greenberg's own acknowledgement of an inconsistency between her deposition and testimony at the hearing. The district court did not credit the bulk of escort Garnick's testimony because of inconsistencies between Exhibit 41, which shows defendant Thomas moving his sign to be parallel to the clinic entrance such that it did not crowd patients, and Garnick's testimony that Thomas made it difficult for a patient to get to the entrance. With regard to escort White, the district court

30

supported its adverse credibility determination with testimony establishing White's memory and eyesight issues. Finally, the Choices security guard Troyd Asmus was not considered credible because, besides his inability to recall certain facts, Asmus admitted that some of his characterizations were overstated, such as his use of the term "shoving paperwork" to refer to reaching out and wanting patients to take the paperwork. *Griepp*, 2018 WL 3518527, at *8 (quoting testimony). Because there is evidence in the record supporting the credibility determinations as to plaintiff's witnesses Greenberg, Garnick, White, and Asmus, these determinations are not clearly erroneous.

### C. Conclusion on the OAG's Evidentiary Challenges

On the evidentiary issues before us, we conclude that it was clear error to give the documentary evidence no weight. This error was harmless as it relates to the PEQs, but not the Recaps. We vacate and remand in part as to the Recaps, but we affirm the district court's credibility determinations as to the plaintiff's witnesses.

## II. Denial of OAG's Motion for a Preliminary Injunction

A preliminary injunction may be granted when the party seeking the injunction can show: (1) a likelihood of success on the merits; (2) irreparable

31

harm; and (3) that a preliminary injunction is in the public interest. *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). "This Court reviews a district court's legal rulings *de novo* and its ultimate denial of a preliminary injunction for abuse of discretion. A district court abuses its discretion when it rests its decision on a clearly erroneous finding of fact or makes an error of law." *Id*. at 36 (internal quotation marks and citations omitted). A factual finding is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 193 (2d Cir. 2001) (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984)).

The OAG appeals the district court's conclusions that it failed to establish (1) a likelihood of success on the merits for all but three of the alleged FACE, NYSCAA, and City Act violations; and (2) irreparable injury for the three remaining violations.

**A. Likelihood of Success on the Merits**

FACE provides for civil and criminal penalties for any individual who, in relevant part, "by force or threat of force or by physical obstruction, intentionally

32

injures, intimidates or interferes with or attempts to injure, intimidate or interfere with any person because that person is or has been, or in order to intimidate such person or any other person or any class of persons from, obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1). Escorts are considered providers for purposes of the statute. *See* S. Rep. No. 103-117, at 26 (1993) (noting that "[p]ersons injured in the course of assisting patients or staff in gaining access to a facility . . . may also sue").

NYSCAA is the state analog to FACE. The applicable statutory text of NYSCAA almost identically mirrors that of FACE. NYSCAA states that "[a] person is guilty of criminal interference with health services . . . in the second degree when: (a) by force or threat of force or by physical obstruction, he or she intentionally injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with, another person because such other person was or is obtaining or providing reproductive health services." N.Y. Penal Law § 240.70(1)(a). Because of their similarities, we interpret the statutes coextensively such that violations of FACE are also violations of NYSCAA, and vice versa.

Both FACE and NYSCAA provide the same definitions for the pertinent terms. "Physical obstruction" is defined as "rendering impassable ingress to or

33

egress from a facility that provides reproductive health services . . . or rendering passage to or from such a facility . . . unreasonably difficult or hazardous. 18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d). The statutes define "interfere with" as "to restrict a person's freedom of movement." 18 U.S.C. § 248(e)(2); N.Y. Penal Law § 240.70(3)(b). "Intimidate" is defined as "to place a person in reasonable apprehension of bodily harm to him- or herself or to another." 18 U.S.C. § 248(e)(3); *see also* N.Y. Penal Law § 240.70(3)(c).

While neither statute defines "force" or "injure," we rely on the common meanings of those terms. In the context of a different federal statute, our Circuit has defined "force" as "power, violence, or pressure directed against a person or thing." *Dickson v. Ashcroft*, 346 F.3d 44, 50 (2d Cir. 2003). "Injure" commonly means "to inflict bodily hurt on." *Injure*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/injure (last visited January 24, 2021).

The statutes also incorporate a dual-intent requirement. Defendants must have both an intent to injure, intimidate, or interfere *and* a motivation to do so "*because* the interfered-with person was seeking, obtaining, or providing, or had obtained or provided, or might obtain or provide, reproductive health services." *Sharpe v. Conole*, 386 F.3d 482, 484 (2d Cir. 2004) (emphasis in original). The

34

legislative history of FACE notes that the requirement that defendants "intentionally injure, intimidate, or interfere" means that the defendant "intends to perform the act and is aware of the natural and probable consequences." S. Rep. No. 103-117, at 24 n.39. Thus, as our Circuit has recognized, even when a protestor's goal is simply to share their beliefs through counseling or literature, the protestor may still be liable for a FACE violation if they intentionally engage in acts which naturally and probably will injure, intimidate, or interfere with someone seeking or providing reproductive health services. *See Operation Rescue*, 273 F.3d at 194 (noting that plaintiffs are likely to prove certain protestor activities violated FACE by disrupting access through physical obstruction despite the possibility that "protestors' purpose may have been to communicate their views").

The City Act is the local counterpart to FACE and NYSCAA. The City Act proscribes, among other acts not at issue here:

> 1. To knowingly physically obstruct or block another person from entering into or exiting from the premises of a reproductive health care facility by physically striking, shoving, restraining, grabbing, or otherwise subjecting a person to unwanted physical contact, or attempting to do the same;

35

2. To knowingly obstruct or block the premises of a reproductive health care facility, so as to impede access to or from the facility, or attempt to do the same;

3. To follow and harass another person within 15 feet of the premises of a reproductive health care facility . . . .

N.Y.C. Admin. Code § 10-1003(a).

The OAG alleges that, contrary to the district court's findings of fact and conclusions of law, Defendants violated FACE, NYSCAA, and the City Act through physically obstructing, making threats of force, using force, and following and harassing Choices patients, their companions, and clinic providers with the requisite intent. We address each of these claims in turn.

## 1. Physical obstruction

Under FACE and NYSCAA, the term "physical obstruction" means "rendering impassable ingress to or egress from a facility that provides reproductive health services . . . or rendering passage to or from such a facility . . . unreasonably difficult or hazardous." 18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d). Our Circuit has interpreted the term to encompass conduct such as obstructing driveway access; slowing or stopping cars with one's body or by dispensing literature through car windows; blocking patients inside their automobiles by standing close to car doors; slowing access with delay tactics

36

such as dropping an item on the ground and retrieving it in slow motion; engaging in protest activities in front of facility entrances and driveways; confronting patients at close range; shouting at patients through a bullhorn; and standing in front of pedestrians entering the building or clinic doors in order to communicate with those entering or exiting. *Operation Rescue*, 273 F.3d at 194-95. Conversely, legitimate protest activities like shouting at arriving patients and protesting in angry tones do not constitute physical obstruction, even if such activities make approaching the clinic "unpleasant and even emotionally difficult." *Id*. at 195.

Physical obstruction need not be direct. In *United States v. Mahoney*, the D.C. Circuit addressed a case in which six defendants knelt or sat in front of an abortion clinic's main entrance. 247 F.3d 279, 283 (D.C. Cir. 2001). The D.C. Circuit held that in doing so, those defendants had violated FACE. *Id.* A seventh defendant, Mahoney, knelt in front of a locked door that was rarely used and largely served as an emergency exit. *Id.* Mahoney argued that because the door was locked, it was impossible for him to render impassable ingress to or egress from the facility. *Id.* He also argued that his selection of this door shows he lacked intent to obstruct or attempt to obstruct access. *Id*. The D.C. Circuit

37

concluded otherwise. The court there said that Mahoney knelt at this door so he would be arrested with the other demonstrators, and in doing so, "Mahoney contributed to the disruption and to the interference with those trying to enter or leave the clinic. . . . By contributing to the demonstration within a few feet of the clinic entrances, Mahoney's actions compelled patients to enter the clinic through the 'crowded and chaotic' rear entrance." *Id.* (citations omitted). The court concluded that Mahoney also did in fact use his body to obstruct the door he knelt in front of even though it was used only as an emergency exit. *Id.*

With these definitions in mind, we turn to the acts the OAG alleges amount to physical obstruction. The OAG maintains that Defendants physically obstructed pedestrians by using their bodies and signs to narrow the sidewalk, crowd patients, block escorts, and hinder patients' paths to the facility. It also contends that Defendants physically obstructed cars by using their bodies to impede both patients getting out of cars and cars leaving the clinic. The district court determined that none of the OAG's video and photo exhibits demonstrate physical obstruction. Following our clear error review of the district court's findings of fact and de novo review of its conclusions of law on this issue, we

38

conclude that many, but not all, of the exhibits show impermissible physical obstruction.

We first discuss the exhibits that in our view show physical obstruction. These are Exhibits 138, 119, 23, 137, 58, 105, and 307. We then address briefly those exhibits that we, in agreement with the district court, consider insufficient to support the OAG's physical obstruction claims. These are Exhibits 7, 41, 102, 39, 55, 49B, and 31.

Exhibit 138

The district court explained that "Exhibit 138 shows that . . . [defendant] Okuonghae approached a patient head on and attempted to provide her a pamphlet." *Griepp*, 2018 WL 3518527, at *44. The district court noted that "[b]ecause Okuonghae was directly in the patient's path, the patient, her companion, and her escorts deviated slightly from their path to get around Okuonghae." *Id*. Even though Okuonghae stood directly in the patient's path and caused her to walk around him, the district court nonetheless concluded Okuonghae did not physically obstruct the patient because he delayed the patient "by one second, at most." *Id*.

39

We disagree. Our precedent does not make length of delay the operative fact. For instance, in *Operation Rescue*, though we concluded that protestors violated FACE by slowing moving cars and standing in front of patients trying to enter the building, nowhere did we so much as mention the length of the ensuing delay. *See* 273 F.3d at 194. That patients were delayed at all is sufficient to establish a violation.

Nor does the statutory definition of physical obstruction as rendering passage "unreasonably difficult" mean that minor delays are intrinsically insufficient to count as violations. The term "unreasonably difficult" is necessarily informed by context and not tied to any single metric or factor. At Choices, there are typically two to three dozen escorts and protestors at a time on the modestly sized sidewalk. Requiring patients to navigate through such a chaotic scene, even if a patient is not subject to a lengthy delay or forced to deviate significantly, is still making the patients' access "unreasonably difficult."

Thus, minor delays can, at least in some circumstances, support a physical obstruction claim. But the district court took it as a matter of course that a minor delay is inherently incidental and insufficient to make a patient's access to the clinic unreasonably difficult under the statute. *See Griepp*, 2018 WL 3518527, at

40

*44. That assumption was legal error. Instead, the district court should consider whether, given the circumstances present, deliberately standing in front of a patient on a crowded and chaotic sidewalk such as the one outside Choices, even for the shortest of times, made the patient's access unreasonably difficult. This is all the statute requires. The dissent claims this conclusion eviscerates the intent requirement of FACE and NYSCAA. We do not think this is the case. We merely discourage the district court from relying on only or largely the duration of the impediment to conclude that Defendants' actions do not violate the statutes.

Exhibit 119

The district court characterized Exhibit 119, a photo, as showing defendant "Musco narrowing the sidewalk by holding two signs perpendicular to the Clinic wall." *Griepp*, 2018 WL 3518527, at *12. The district court specifically noted, however, that Musco was "narrowing the low-traffic portion of the sidewalk to the south of the Clinic entrance, facing her sign north" and thus seemed "to be making her signs visible to the majority of patients who approach from Jamaica Avenue—all of whom would reach the Clinic door without passing Musco." *Id*. Although Musco was narrowing the sidewalk, the district court said that, even if the OAG could establish intent to obstruct access, Exhibit 119 did not

41

demonstrate obstruction because "the photo does not show any patients approaching, and because patients rarely approached Choices' main entrance from the south." *Id*. (citations omitted). This constitutes legal error.

We first address whether the OAG could establish that defendant Musco acted with the requisite intent in Exhibit 119. The district court suggested there was insufficient evidence of intent because Musco was simply making her signs visible to patients coming from Jamaica Avenue. Yet Musco's aim of having her sign viewed does not foreclose a finding of intent under our precedent. The desire of protesters to communicate their message is not mutually exclusive with an intent to interfere, intimidate, or injure. *See Operation Rescue*, 273 F.3d at 194. Rather, the OAG needed only to establish that Musco intended to place her signs in this manner and was aware that interference, intimidation, or injury was a natural and probable consequence of doing so and that she did so "out of an abortion-related motive." *See* S. Rep. No. 103-117, at 24 n.39. Given that Musco's signs spanned approximately two-thirds of the sidewalk and significantly shortened the space available for walking, we cannot say that Musco was unaware that her signs would interfere with pedestrian access. Musco was also clearly acting out of an abortion-related motive, given the content of her sign and

42

the plethora of evidence on the record supporting this motive. We therefore disagree with the district court's suggestion that Musco did not possess the necessary intent.

The district court also relied on the lack of patients in the photograph and the low-traffic area in concluding there was no obstruction. That no patients were in the photograph does not preclude a FACE violation, however. For one, the statute prohibits *attempted* obstruction, not just actual obstruction; defendant Musco could accordingly still have violated FACE even if no patient ever appeared. *See* 18 U.S.C. § 248(a)(1). Moreover, a defendant is liable for physical obstruction even when the relevant acts occur in a low-traffic area. FACE broadly prohibits obstruction of "ingress to or egress from a facility." *Id.* § (e)(4). It does not limit violations to only heavily frequented areas. *See Mahoney*, 247 F.3d at 283-84 ("The statute does not distinguish between frequently used and infrequently used means of egress . . . ."). To decide that no FACE violation occurred because few patients rarely approached the Choices entrance from the south would impermissibly alter the terms of the statute and read in a requirement that does not exist. *See Va. Uranium, Inc. v. Warren*, 139 S. Ct. 1894,

43

1900(2019) ("In this, as in any field of statutory interpretation, it is our duty to respect not only what Congress wrote but, as importantly, what it didn't write.").

In placing her signs so that they spanned two-thirds of the sidewalk and thereby significantly limited the space available, defendant Musco did engage, or attempt to engage, in physical obstruction. Musco's goal of making her signs visible, the lack of patients in the photograph, and the sidewalk's infrequent use do not change our conclusion.

Exhibit 23

The district court described Exhibit 23 as showing escort "Brady and another escort accompanying a patient . . . to the main [Choices] entrance" when both escort program director Greenberg and defendant Okuonghae approach the patient and escorts. *Griepp*, 2018 WL 3518527, at *18. "Greenberg is in the patient's path" while Okuonghae is "reaching out his arm in an attempt to hand [the patient] a pamphlet." *Id*. "Greenberg then moves out of the way as the patient's two escorts step in front of her and motion for Okuonghae to get even further out of the way." *Id*. The district court said that there is no obstruction in Exhibit 23, just "escorts briefly and accidentally stepping in front of patients'

44

paths to the Clinic." *Id*. at *43.[11] We find that the district court took an unduly narrow approach in assessing whether obstruction occurred.

Though it may have been an escort that stepped in front of the patient, defendant Okuonghae and other protestors indirectly obstructed the patient by causing this result. Exhibit 23 shows protestors approaching from various angles. Crowding in this manner and thereby creating a logjam in which others inadvertently impede a patient is still obstruction. As the D.C. Circuit has said, FACE "does not limit physical obstruction to bodily obstruction, but rather is broadly phrased to prohibit any act rendering passage to the facility unreasonably difficult." *See Mahoney*, 247 F.3d at 284. Rather, just as Mahoney was liable for physical obstruction by indirectly forcing patients to enter the clinic in a crowded and chaotic fashion, defendant Okuonghae and the other protestors in this exhibit may be so liable here.

---

[11] The district court also stated that the "entire interaction slows the patient's access to Choices by perhaps a second." *Griepp*, 2018 WL 3518527, at *18. To the extent the district court meant this observation to serve as an additional reason for why no obstruction is present in Exhibit 23, we reiterate that for the reasons we provided in our discussion of Exhibit 138, *supra*, even a momentary delay could render access unreasonably difficult.

45

We are thus not persuaded that simply because escort program director Greenberg, rather than Okuonghae, stepped in front of the patient, no physical obstruction occurred. Okuonghae and the other protestors' actions in crowding patients and escorts necessarily caused Greenberg to step in front of the patient. This crowding consequently rendered passage to Choices unreasonably difficult and constitutes physical obstruction.

Exhibits 137, 58, and 105

The next three exhibits we address, Exhibits 137, 58, and 105, involve protestor conduct around vehicles. The district court determined that these exhibits fail to show FACE violations. *Griepp*, 2018 WL 3518527, at *43. Yet our precedent compels the opposite conclusion.

Exhibit 137 shows that, after program director Greenberg escorted a patient from a car to the clinic, defendant "Thomas stepped to the open car door and leaned down to speak to the driver" for approximately one minute. *Id*. at *15. It is apparent that while Thomas was standing in between the car and the open passenger door, it would have been unreasonably difficult or hazardous for the driver to leave the clinic. If the car had attempted to pull away, the car door could have slammed shut on Thomas. And because impeding a vehicle's exit

46

from a facility is physical obstruction, 18 U.S.C. § 248(e)(4) (defining physical obstruction as rendering impassable or unreasonably difficult or hazardous "ingress to *or egress from* a facility" (emphasis added)); N.Y. Penal Law § 240.70(3)(d) (same); N.Y.C. Admin. Code. § 10-1003(a)(2) (prohibiting conduct to "impede access to *or from* the facility" (emphasis added)), there is no question that Defendant Thomas's conduct in Exhibit 137 falls squarely within the statutory definition of physical obstruction. *See Operation Rescue*, 273 F.3d at 194 (stating that defendant physically obstructed cars by "using her body to slow moving cars and pushing literature and pamphlets through car windows").

The district court's treatment of Exhibits 58 and 105 is similarly flawed. The district court states that "Exhibit 58 shows [defendant] Okuonghae leaning beside and speaking into an open car window," but then goes on to state that it "does not suggest a non-consensual interaction—let alone that Okuonghae obstructed access to or from the Clinic." *Griepp*, 2018 WL 3518527, at *18. Yet while Okuonghae is next to the car window, his hands touch the passenger window frame and even enter the car when gesturing. Ex. 58. Had the car driven away while Okuonghae's hands were on the window frame or inside the car, the window frame would have struck Okuonghae's hands. Okuonghae's conduct

47

thus caused the car's egress from the clinic to be unreasonably difficult or hazardous.

Similarly, in Exhibit 105, after a patient has left her car and walked to Choices, defendant Musco "approach[es] the car and attempt[s] to hand the driver a pamphlet." *Id*. at *12. "Musco appears to speak to the driver for about thirty seconds before returning to her post on the sidewalk . . . ." *Id*. The district court concluded that this exhibit did not show a "non-consensual interaction[]— let alone that Musco . . . impeded the driver[] from leaving." *Id*. at *12. But Musco is physically leaning onto the passenger door, resting her purse and her hands on the passenger window frame. Ex. 105. This made the car's egress unreasonably difficult or hazardous because driving away with Musco leaning onto the door would have caused Musco to collide with the car or fallen.

The dissent takes issue with our visual interpretation of these exhibits. Despite acknowledging that the videos were short and without enough contextual information to discern consent, the dissent contends that we improperly impose our interpretation over the district court's evaluation that the conversations were consensual. However, this disagreement splits hairs and misses the point. There is no statutory exception for consensual conversations.

48

The question is whether an individual, with the intent to "intimidate such person . . . from[] obtaining or providing reproductive health services," "render[s] passage to or from such a facility . . . unreasonably difficult or hazardous." 18 U.S.C. § 248(a)(1), (e)(4). Okuonghae and Musco's intrusions into vehicles, making it difficult and hazardous for drivers to move away from them, clearly impedes passage to or from the facility. This falls directly within the confines of conduct we have previously discussed as violative of FACE. *See Operation Rescue*, 273 F.3d at 194.

The district court's legal analysis regarding the *import* of these clips was erroneous because it improperly focused on whether the conversations appeared consensual rather than on whether defendants Okuonghae or Musco's actions rendered the cars' egress unreasonably difficult or hazardous. Rather, the statutory elements are satisfied here. Okuonghae and Musco's conduct in touching the cars in this manner made the cars' egress unreasonably difficult or hazardous, satisfying the physical obstruction requirement. *See Operation Rescue*, 273 F.3d at 194. It also restricted the cars' freedom of movement, satisfying the interference requirement. Therefore, regardless of whether the conversations

49

appeared consensual, defendants Okuonghae and Musco violated FACE and NYSCAA by physically obstructing the cars in Exhibits 58 and 105.

Exhibit 307

We next turn to Exhibit 307. We believe the district court's analysis of this exhibit relied on clearly erroneous findings of fact. The district court stated that in Exhibit 307, a patient's access "was accidentally and briefly impeded" by an escort. *Griepp*, 2018 WL 3518527, at *11. According to the district court, defendant "R. George reached the patient first and handed the patient a pamphlet." *Id*. Afterwards, two escorts reached the patient and positioned themselves on either side of her; in doing so, one escort "stepp[ed] in front of R. George and slow[ed] his pace, forcing R. George to step around the escort to access the patient and continue his attempts to engage her in conversation. As R. George did so, the escort on the far side of the patient stepped partially and then completely in front of her in an attempt to block R. George's access to her." *Id*. (citation omitted). The patient then had to "slow down and then walk around the other side of the escort standing in front of her." *Id*. The district court held that R. George "neither intended to impede the patient's access to the Clinic entrance, nor did so in fact"

because the obstruction resulted from "the escort's attempts to block R. George from reaching the patient." *Id*.

The district court clearly erred in its interpretation of the video. Exhibit 307 shows that defendant R. George actively stepped around the escort to access the patient. He was then walking directly in front of the patient for a few moments while attempting to engage with the patient. As a result, both the patient and the escort slowed to a near stop, and the patient was forced to walk around to the other side of both escorts to have a clear path into the clinic. Ex. 307. After the patient had proceeded into Choices, R. George returned down the length of the sidewalk and was reprimanded by a police officer for blocking the patient. Ex. 307.

Positioning oneself directly in front of a patient in this manner is obstruction. *See Operation Rescue*, 273 F.3d at 194 (noting that standing in front of patients and clinic doors is obstruction). The dissent also acknowledges that R. George did step in front of the patient, highlighting that the impediment was brief and that the patient nevertheless was able to enter Choices. Though the patient may not have stopped walking, the statutes do not require that the patient come to a standstill or for ingress to be rendered impossible for a

51

violation to occur. Defendant R. George's conduct made the patient's access unreasonably difficult because it forced her to change course in the midst of a busy and crowded sidewalk. *See Mahoney*, 247 F.3d at 284 (explaining that indirect forms of obstruction are covered by the "broadly phrased" FACE). Therefore, R. George physically obstructed the patient in violation of the statutes.

Exhibit 7

We agree with the district court's conclusions that Exhibits 7, 41, 102, 39, 55, 49B, and 31 do not show physical obstruction in violation of FACE. The dissent characterizes this conclusion as one that we are disappointed to reach in a pre-ordained attempt to "disturb" the district court's impressive and careful work. Dissenting Op. at 3. That is, of course, far from the truth. As with any record as complex and multi-faceted as this, it is entirely plausible for some of the district court's analyses to be correct and some incorrect. That we reach different conclusions on different portions of the record is not indicative of any analytical flaw but rather the consequences of our duty, which is to apply the most precise interpretation of the law to the varying facts before us.

Turning first to Exhibit 7, the district court said the video "shows [defendant] Braxton attempting to speak with or hand pamphlets to a handful of

52

approaching patients and companions over the course of nearly six minutes. It does not show Braxton stopping, slowing, or otherwise delaying anyone's access to the Clinic door." *Griepp*, 2018 WL 3518527, at *43 (citation omitted). We agree with the district court's characterization of defendant Braxton's conduct. Simply attempting to speak with or hand pamphlets to patients, without more, does not give rise to a FACE violation. Because there is no indication that Braxton did, or attempted to, delay or otherwise inhibit access to Choices, Exhibit 7 does not show impermissible physical obstruction.

Exhibits 41 and 102

Exhibit 41 shows defendant "Thomas simply lift[ing] up his sign in an attempt to make it visible to" the approaching patient, who walks into Choices without impediment. *Griepp*, 2018 WL 3518527, at *15 Similarly, Exhibit 102 shows "Thomas stand[ing] in the same spot on the sidewalk with a sign and a handful of pamphlets." *Id*. With regard to Exhibits 41 and 102, the district court wrote that the exhibits show defendant "Thomas standing in the middle of the sidewalk, directly in front of the Clinic entrance," but that neither exhibit shows Thomas blocking, delaying, or otherwise obstructing patients. *Id*. We affirm the district court's conclusion as to these two exhibits. In neither video were the

53

signs positioned in such a way that they narrowed the sidewalk or otherwise caused crowding.[12] Nor is Thomas standing directly in front of the entrance such that entering or exiting the facility would be unreasonably difficult or hazardous. Accordingly, Thomas did not physically obstruct patients or escorts with his signs in either exhibit.

Exhibit 39

Exhibit 39 shows defendant "R. George approach[ing] a patient and her companion as they exited their car and removed a child from the back seat. Once R. George approached the patient and companion, it appears that four protestors—Musco, Okuonghae, Thomas, and R. George—were speaking to them at the same time." *Id*. at *11 (citation omitted). "After about one minute, the patient took a stroller from the back seat of the car to the end of the sidewalk, where three protestors and two escorts were standing. One of the escorts was in the patient's direct path, and immediately moved out of the way. The patient

---

[12] With regard to Exhibit 102, the district court noted that "[f]ar from showing obstructed patient access to the Clinic, Exhibit 102 does not show even a single patient trying to enter the facility." *Griepp*, 2018 WL 3518527, at *15. Though we agree that the video does not show obstruction, we reiterate that the absence of patients in the exhibit is insufficient to preclude a FACE violation, as discussed with Exhibit 119, *supra*.

then put the child in the stroller and walked into [Choices] without impediment as Okuonghae spoke to the patient's companion." *Id.* at *18 (citations omitted).

As the district court noted, "[n]one of the protestors obstructed or otherwise impeded the patient's or the companion's access to the Clinic." *Id.* at *11. Although defendant R. George approached the car, neither he nor any other protestor stood so close to the car that they inhibited the patient's movements in securing her child or moving towards Choices. Though we recognize that protestors approaching a patient as she attempts to get a young child out of the car can be overwhelming and intimidating, absent delay or impairment of some kind, we cannot say that physical obstruction occurred.

Exhibit 55

In Exhibit 55, defendant "Richards and two nearby escorts spotted the approaching patient at the same time." *Id.* at *20. The escorts "established body position on Richards, boxed her out, and created a lane to the door for the approaching patient." *Id.* Richards "quickly found herself in the patient's way" after she "attempted to dart through that lane to reach the patient," and when "Richards immediately attempted to get out of the way and reach the patient on the other side of one of the escort[s]," the patient "did the same, causing Richards

55

to be in the patient's way once again." *Id*. After the patient gestured that she was attempting to reach the clinic entrance, "Richards responded by quickly moving out of her way and abandoning her attempt to interact with the patient." *Id*.

Though the district court concluded that Richards "briefly impeded a patient's access to Choices," *id*., she did so without the requisite intent, *id*. at *44. We agree. Although some minor delays may constitute a FACE violation in certain circumstances, the statute requires a defendant be aware of the natural and probable consequences of her action for the intent requirement to be satisfied. S. Rep. No. 103-117. Richards moved quickly out of the patient's way after realizing that she was standing in front of her, which belies the OAG's argument that Richards intended to physically obstruct the patient. Richards's conduct is also an important comparison with R. George's conduct in Exhibit 307. During that incident, R. George directly stepped in front of the patient and continued to engage with her from that position. Although R. George ultimately left, he did not do so with the urgency and immediacy demonstrated by Richards, which suggests her blockage was inadvertent. Moreover, the movements of Richards, the escorts, and the patient in Exhibit 55 were largely simultaneous, making it difficult to distinguish between intent and inadvertence.

56

Because the OAG has not met its burden in demonstrating intent, Exhibit 55 does not show obstruction.

Exhibit 49B

The district court noted that Exhibit 49B shows defendant Musco "attempting to hand the driver of a car a pamphlet through an open car window." *Griepp*, 2018 WL 3518527, at \*12. Musco "lean[ed] into the open passenger-side window[] of" the car and was "speaking with the occupants." *Id*. Because the conversation seemed consensual, the district court suggested that it could not conclude Musco physically obstructed the car. *Id*. We affirm the court's conclusion but on different grounds. As we explained in our discussion of Exhibits 58 and 105, *supra*, FACE violations do not turn on the appearance of consent. In those exhibits, violations were apparent because defendants Okuonghae and Musco were physically touching the car, making it unreasonably hazardous or difficult for the cars to drive away. Here, however, Musco is neither touching the car nor leaning so far into the window that driving away would have been hazardous or difficult at all, let alone unreasonably so. On this basis, we agree that Exhibit 49B does not show physical obstruction.

<u>Exhibit 31</u>

Similarly, Exhibit 31 does not show physical obstruction. As we explained in section I.B.1, *supra*, the district court's characterization of Exhibit 31 was not clearly erroneous. Because the district court found that "the escorts were not trying to walk toward an arriving patient at all," *Griepp*, 2018 WL 3518527, at *11 (internal quotation marks omitted), there is no argument that defendant R. George blocked the escorts' path to the patient. Nor does the video show R. George impeding the patient's access to the Clinic, as the OAG argues, because the approaching patient "walked right past [R. George] without deviating from her path or breaking her stride at all." *Id*. We therefore agree with the district court that Exhibit 31 does not show physical obstruction.

<u>Conclusion on the OAG's Physical Obstruction Claim</u>

The dissent contends that, in our careful review of the exhibits and our conclusions on each, we have eviscerated the intent requirements of the requisite statutes and, in effect, created "buffer zone" statutes like the one discussed in *Hill v. Colorado*. *See* 530 U.S. 703, 707 (2000); *see also* Dissenting Op. at 17-20. At the outset, we note that the statutes at issue here prohibit not only "intentionally injur[ing or] intimidat[ing]" individuals seeking or providing reproductive

58

health services, but also the less severe act of even "interfer[ing]" with them. 18 U.S.C. § 248(a)(1); *see also* N.Y. Penal Law § 240.70(1)(a). Focusing on exclusively the first two categories of acts might suggest that only extreme protester behavior qualifies, but that would ignore the text of the statutes, which clearly also include intentional interference. Interference, in turn, "means to restrict a person's freedom of movement." 18 U.S.C. § 248(e)(2); *see also* N.Y. Penal Law § 240.70(3)(b). This encompasses a wide swath of conduct.

In any event, a review of our actual conclusions reveals that we have neither ignored the intent requirements nor inadvertently created "buffer zone" statutes but rather embarked on a careful, fact-based review to provide guidance on where district courts should draw lines in this challenging area of the law. In many of the exhibits discussed above, we have affirmed the district court's judgment that there was no physical obstruction despite the limited space between patients, escorts, and protesters. In our view, it is indeed possible for protesters to be on the same sidewalk as patients and escorts and even for them to interact with them, as long as they do not tread into the zone of "interference." What we deem legal error is the addition of unwritten requirements to this cause of action—such as a requisite length of obstruction, or that only frequently used

59

ingresses or egresses are capable of being obstructed. Moreover, our interpretation of intent is consistent with the common legal understanding of scienter and the legislative history of the applicable statutes, which adds to traditional scienter only the requirement "that the offender acted out of an abortion-related motive." S. Rep. No. 103-117, at 24 n.39; *see also, e.g., United States v. Aguilar*, 515 U.S. 593, 598-99 (1995) (explaining that, under 18 U.S.C. § 1503, which forbids any "endeavor[] to influence, intimate, or impede" jurors or court officers, what matters is whether the act has "the natural and probable effect of interfering with the due administration of justice" (internal quotation marks omitted)).

We hold that FACE prohibits, in certain circumstances, delaying patients even for a brief amount of time, crowding patients directly or indirectly with bodies or signs, and touching or leaning into the windows and doors of cars exiting a facility. Accordingly, the district court erred in concluding that Exhibits 138, 119, 23, 137, 58, 105, and 307 did not demonstrate physical obstruction.

### 2. Threats of force

FACE proscribes making a "threat of force," which our Circuit has interpreted to mean only true threats not protected under the First Amendment.

*Operation Rescue*, 273 F.3d at 194. When reviewing a district court's determination on the issue of whether particular speech was a true threat, we conduct an independent examination of the record as a whole. *Id*. at 196.

To determine whether speech is a true threat, we ask whether an ordinary, reasonable recipient familiar with the context of the communication would interpret the speech as a threat of injury. *United States v. Turner*, 720 F.3d 411, 420 & n.4 (2d Cir. 2013). Our inquiry is informed by whether the threat is, on its face and under the circumstances, so "unequivocal, unconditional, immediate and specific as to the person threatened as to convey a gravity of purpose and imminent prospect of execution." *Operation Rescue*, 273 F.3d at 196. However, we have still found threats "that were both conditional and inexplicit." *Turner*, 720 F.3d at 424. Nor is there any requirement that the statements on their face show that the defendant personally intended to take violent action, *id.*, but the recipient must be afraid of the threat's execution by the speaker or their co-conspirators, *Operation Rescue*, 273 F.3d at 196.

Context is also critical. For instance, in *United States v. Dillard*, the reference of a murdered abortion provider in a letter gave it "an additional threatening undertone." 795 F.3d 1191, 1201 (10th Cir. 2015). In *Dillard*, the defendant sent a

61

letter to Dr. Means, who planned to provide abortion services. *Id.* at 1196. Dr. Tiller, the last doctor to do so in the area, had been shot one year earlier by an anti-abortion activist. *Id.* The defendant's letter to Dr. Means, which sought to persuade Dr. Means to change her plans, writing, "[i]f Tiller could speak from hell, he would tell you what a soulless existence you are purposefully considering, all in the name of greed." *Id.* The letter also said, "You will be checking under your car everyday—because maybe today is the day someone places an explosive under it." *Id.* Dr. Means was "very anxious that Defendant or her associates would indeed place an explosive under her car as suggested by the letter." *Id.* at 1197. The United States brought a civil enforcement action under FACE, alleging that the defendant's letter constituted a threat of force against Dr. Means. *Id.* at 1197-98. The district court in *Dillard* granted summary judgment based on the defendant's argument that the alleged threat was not imminent, likely, or unconditional and because the letter said nothing about what the defendant would do, only what others might do. *Id.* at 1198.

The Tenth Circuit reversed. The Tenth Circuit first explained that, simply because the letter was conditional (in that it suggested Dr. Means faced harm if she followed through on her plan to provide abortion services) did not preclude

a conclusion that it was a threat of force. *Id.* at 1200. The court then said that although the letter "suggested violence was not imminent, but would potentially occur only at some point in the future after Dr. Means began offering abortion services," a threat of violence need not be imminent so long as it "conveys a gravity of purpose and likelihood of execution." *Id.* (brackets omitted) (quoting *United States v. Crews*, 781 F.2d 826, 832 (10th Cir. 1986). Finally, the Tenth Circuit noted that even though the defendant "only stated that an unidentified 'someone' might place explosives under Dr. Means' car," the letter could still be reasonably seen as a threat because "a direct statement of personal intent is not necessary" for a communication to be so construed. *Id.* at 1200. The court explained that a "defendant cannot escape potential liability simply by using the passive voice or couching a threat in terms of 'someone' committing an act of violence, so long as a reasonable recipient could conclude, based on the language of the communication and the context in which it is delivered, that this was in fact a veiled threat of violence by the defendant or by someone acting under her direction or in conspiracy with her." *Id.* at 1201. And given the area's history of violence against abortion providers, Dr. Tiller's murder, and the defendant's relationship with Dr. Tiller's murderer, "the letter's reference to someone placing

63

an explosive under Dr. Means' car may reasonably be taken as a serious and likely threat of injury." *Id.*

Similarly, the Ninth Circuit relied on context in holding that "GUILTY" posters identifying specific physicians working at reproductive health clinics were true threats. *Planned Parenthood of the Columbia/Willamette, Inc. v. Am. Coalition of Life Activists*, 290 F.3d 1058, 1062, 1085 (9th Cir. 2002). These posters "were circulated in the wake of a series of 'WANTED' and 'unWANTED' posters that had identified other doctors who performed abortions before they were murdered." *Id*. at 1062. Like the "WANTED" and "unWANTED" posters, the "GUILTY" posters included the names and addresses of the physicians identified. *Id*. at 1064-65. The physicians identified on the "GUILTY" posters were aware of the circulation of "WANTED" and "unWANTED" posters and of the identified doctors' subsequent deaths. *Id*. at 1066. These physicians were thus frightened by the "GUILTY" posters, just as the posters' creators had expected. *Id*. at 1065-66.

The Ninth Circuit held that, although the "GUILTY" posters did not contain any language that was "overtly threatening," the true threat analysis "turns on the poster pattern." *Id*. at 1085. Namely, "it is use of the 'wanted'-type

64

format in the context of the poster pattern—poster followed by murder—that constitutes the threat." *Id*. Thus, even though the posters did not contain overtly threatening language, "knowing this pattern, knowing that unlawful action had followed 'WANTED' posters . . ., and knowing that 'wanted'-type posters were intimidating and caused fear of serious harm to those named on them," the defendants made the "GUILTY" posters and therein used a threat of force. *Id*. In other words, the posters "connote something they do not literally say, yet both the actor and the recipient get the message." *Id*.

Similarly, the Eighth Circuit found that parking two Ryder trucks, unattended and with no apparent purpose, in the entrance driveways of clinics was a true threat. *United States v. Hart*, 212 F.3d 1067, 1072 (8th Cir. 2000). Clinic employees were "alarmed by the presence of the trucks" because it reminded them of the 1995 Oklahoma City bombing, which also involved a Ryder truck. *Id* at 1070. The defendant argued that the trucks were not inherently dangerous or accompanied by threats of death or physical injury, so their placement alone cannot be considered a threat of force. *Id*. at 1072. The Eighth Circuit rejected this argument. Relying on the circumstances of an unexplained truck parked near the clinics "coupled with the similarity to the well-known events of the Oklahoma

City bombing," the court said that the trucks "were reasonably interpreted by clinic staff and police officers as a threat to injure." *Id*.

Thus, with an eye to context, we assess whether the statements the OAG raises in this appeal were true threats. The OAG argues the district court erred in concluding that the following statements were not true threats: (1) defendant Thomas's statements to escorts, following a shooting by an anti-abortion protestor at a Planned Parenthood in Colorado, that "[y]ou never know when you're going to die," that "they could die at any moment," that "they never know when death may come," and that "they could die from being shot by a bullet while on the sidewalk," *Griepp*, 2018 WL 3518527, at *35 (citations and internal quotation marks omitted); (2) Thomas's statements to escort program director Greenberg following a knife fight between two unknown persons across the street from Choices that "[t]hat could be you one day. Someone could pull a knife on you," *id*. (citation omitted); (3) Thomas's statements to patients, made when standing within inches of patients at times, that the escorts "won't be here when you leave," *id*. at *38 (quoting testimony); (4) Thomas's statement to Greenberg that she was "going to kick the bucket soon, Marylou," *id*. at *35 (citation omitted); and (5) defendant R. George's statement to escorts that "the

66

people who went to work on 9/11 didn't know what was going to happen that day, you never know when you're going to die," *id*. (quoting record). We conclude that of these statements, only defendant Thomas's statements to the escorts after the Planned Parenthood attack, Thomas's statements to Greenberg after the knife fight, and Thomas's statements to patients are true threats.

Thomas's Statements to the Escorts After a Planned Parenthood Attack in Colorado

The district court did not construe the statements made by defendant Thomas to escorts that "[y]ou never know when you're going to die," that "they could die at any moment," that "they never know when death may come," and that "they could die from being shot by a bullet while on the sidewalk," *Griepp*, 2018 WL 3518527, at *35 (citation omitted), as true threats primarily because Thomas regularly preached about the fragility of life and the need to repent, *id*. The district court placed special emphasis on the fact that one escort had testified that Thomas said "you never know when you're going to die" nearly every Saturday and connected this statement with repentance and acceptance of God. *Id*. (quoting testimony). The district court discounted the escorts' fears further by noting that escort Garnick testified that the escorts "wondered 'whether to take

67

that as a serious threat and whether it was necessary to call the police'" but also expressed "'concern[]'" that the threat "'was vague and often, when they fill out a complaint, they want more specific threats.'" *Id*. at \*36. We come to a different conclusion based on our review of the record.

In context, a reasonable recipient would interpret the statements as true threats. The context here includes the shooting at Planned Parenthood just a few months prior, and as our sister circuits have noted, past violence—especially violence against abortion clinics or providers—weighs heavily in favor of finding that a statement rises to the level of a true threat. *See Dillard*, 795 F.3d at 1201; *Planned Parenthood*, 290 F.3d at 1078-79; *Hart*, 212 F.3d at 1071. In light of this, a reasonable recipient of these statements, such as the statement referencing a specific act of violence or cause of death ("being shot by a bullet," *Griepp*, 2018 WL 3518527, at \*13 (citation omitted)), would view the statements as a veiled threat that either defendant Thomas or one of his fellow protestors would carry out.

Defendant Thomas's words here are very different from the merely unsettling political expression at issue in *Operation Rescue*. There, the statement that "killing babies is no different than killing doctors," 273 F.3d at 196, was

68

simply an articulation of the protestor's beliefs that the fetuses are equal to doctors and the moral culpability between the two acts is similar. The statement carries no implication of future violence. In contrast, the statements here not only referenced the escorts' deaths, but also specifically mentioned shooting as a possible cause of their deaths. Given these facts, an ordinary, reasonable person would interpret Thomas's statements to the escorts as threats.

We do not agree that defendant Thomas's frequent preaching about death and repentance minimizes the threatening aspect of the speech. The two are not comparable. A statement that "you never know when you're going to die" is fundamentally different from a statement that you "could die from being shot by a bullet while on the sidewalk" shortly after a shooting. The specification of the means of death in combination with the analogy to a recent incident of violence transforms the statements at issue into something more insidious and objectively threatening. *See Dillard*, 795 F.3d at 1201; *Planned Parenthood*, 290 F.3d at 1078-79; *Hart*, 212 F.3d at 1071.

The statements were also subjectively frightening. There is evidence in the record that the escorts felt the statements were "threatening and scary." App'x at 1203, 2263. The testimony that the escorts wondered whether to report the

69

shooting threat to the police does not undercut this evidence. Rather, it shows that the escorts were alarmed and wanted police intervention, but they worried they would not be taken seriously because of the high bar required for police action. Instead of undermining the escorts' fear, this testimony reinforces it.

With the context of violence at abortion centers, the statements defendant Thomas made referencing these events in conjunction with the escorts' deaths is more than enough for a reasonable person to interpret the statements as true threats.

Thomas's Statements to Greenberg after a Knife Fight near Choices

For the same reasons, we conclude that defendant Thomas's statement to escort program director Greenberg following a knife fight between two unknown persons across the street from Choices that "[t]hat could be you one day. Someone could pull a knife on you," *Griepp*, 2018 WL 3518527, at *35 (citation omitted), would be interpreted by a reasonable recipient as a true threat. Although this statement does not allude to violence at an abortion center, its reference to an attack near Choices has the same effect. The context of a Choices-specific incident shifts the statement from the abstract into the concrete. Having seen the knife fight nearby firsthand, Greenberg was aware that such an attack

70

was not only conceivable but also a reality in that area. As a result, the context of the knife fight makes defendant Thomas's comment here, like the comments about being shot, alarming to a degree that a reasonable listener would construe it to be a threat of violence.

Thomas's Statements to Patients

The district court did not consider defendant Thomas's telling patients entering Choices that the escorts "won't be here when you leave" to be a true threat. *See id.* at *38 (quoting testimony). The district court rested its determination primarily on its belief that the statement was equivocal and the fact that Thomas never preaches in a threatening tone in the video evidence, so there is no reason to believe that he made this statement in a threatening tone either. *Id.* We disagree.

A reasonable patient familiar with the context of the statement would find it threatening. We believe the statement that the escorts "won't be here when you leave" is on its face specific, immediate, and unequivocal. The statement was said directly to patients, sometimes within inches of them. *Id*. In addition, the statement conveys a sense of immediacy because Thomas tells patients as they enter the clinic what will occur upon their exit. *See id*. Furthermore, the statement

71

is unequivocal in stating that escorts "won't" be there for patients when they leave. Although the statement references a future harm and contains no explicit statement of personal intent, the implication of impending harm is clear. This warning would leave a reasonable patient with the marked perception that Thomas or the other protestors might harm them after the escorts leave for the day, thereby constituting a veiled threat. *See Dillard*, 795 F.3d at 1201 (warning that "rigid adherence to the literal meaning of a communication without regard to its reasonable connotations . . . would render [FACE] powerless against the ingenuity of threateners who can instill in the victim's mind as clear an apprehension of impending injury by an implied menace as by a literal threat" (omission in original) (quoting *Turner*, 720 F.3d at 422)).

The district court suggests that escort Garnick's testimony concedes that Thomas's statement was equivocal. *Griepp*, 2018 WL 3518527, at *38. We are not convinced. Garnick testified that patients "found it scary that there's some implication that having escorts there kept them safe, and that if they weren't there, that they could be at risk of harm." App'x at 1196. She went on to say she knew patients found the statements scary because they asked her how to leave if there were no escorts and what risk they faced, "showing some sort of fear that

harm could come to them." App'x at 1196. This testimony does not indicate that Thomas's words were too vague to be threatening. To the contrary, Garnick's testimony, especially her statement that patients asked her how to leave without escorts, makes clear that patients found the statements scary and suggestive of harm. We do not agree with the district court that Garnick's use of words such as "some implication" serves as proof that the statement did not convey a concrete threat of harm. *Griepp*, 2018 WL 3518527, at *38 (quoting testimony). "Some implication" in our minds means nothing less than "an implication." Parsing Garnick's diction in this fashion misses the forest for the trees. Garnick provides concrete examples of patients' fear in the face of Thomas's words. Especially given the context of the escorts' function as buffers from the protestors, we think a reasonable patient would perceive Thomas's words as threatening.

Nor does the notion that Thomas did not typically preach in a threatening tone debunk this conclusion. Thomas's tone when preaching is not informative of his tone when making this statement to a patient. Though they perhaps share a goal of reducing support for Choices, the similarities between Thomas's preaching and this statement end there. When Thomas preaches publicly, he encourages acceptance of God. This is an abstract concept that deals in ideology

73

and religion, not fear. However, when Thomas stands within inches of patients and speaks directly to them just before they enter Choices, he invokes physical harm as a last-ditch attempt to prevent them from using Choices. That Thomas might not sound threatening while generally preaching does not preclude the fact that he could be threatening at other moments, especially in the final moments before a patient enters Choices, after that patient has ignored his preaching. Certainly, one can inspire fear with a whisper as much as a scream. *See Turner*, 720 F.3d at 422.

Because the speech was specific, immediate, and unequivocal, a reasonable patient would interpret defendant Thomas's words as threatening.

### Thomas's Statement to Greenberg

We cannot say, however, that defendant Thomas's statement to escort program director Greenberg that she will "kick the bucket soon" is a true threat. *Griepp*, 2018 WL 3518527, at \*13 (citation omitted). There is no discussion in the record regarding Greenberg's reaction to this statement. It is also divorced from the context that make some of Thomas's other statements threatening. As such, there is insufficient evidence to show the statement aroused fear, as required for a true threat.

74

<u>R. George's Statement to Escorts</u>

The district court also held that defendant R. George's statement to escorts that "the people who went to work on 9/11 didn't know what was going to happen that day, you never know when you're going to die" was not a true threat. *Griepp*, 2018 WL 3518527, at *35 (quoting testimony). The district court said this was merely part of R. George's preaching and pointed to escort Brady's testimony that R. George spoke often about death when preaching, and after making the comment at issue, R. George spoke about repenting. The district court also concluded that the escorts did not find R. George threatening based on a video posted to social media in which one of the recipient-escorts makes light of R. George while he is within earshot. With regard to this statement, we see no reason to disturb the district court's conclusions.

Although we recognize that defendant R. George, like defendant Thomas, referenced a tragedy in making this statement, the context of, and reaction to, R. George's statement differentiates it from Thomas's. For instance, because R. George discussed repentance directly after making the statement at issue, it is much more likely that a reasonable recipient would interpret the statement as simply part of his preaching. Two additional contextual factors support our

75

conclusion. For one, R. George does not refer to abortion-specific or Choices-related violence, as Thomas did with his shooting and knife comments.

Moreover, unlike with Thomas's statements, there is no strong temporal proximity between R. George's statement and the referenced tragedy.

Furthermore, as the district court observed, the record suggests there was a lack of subjective fear on the escorts' part, given the social media video.

For these reasons, we affirm the court's conclusion that R. George's statement was not a true threat.

Conclusion on the OAG's Threat-of-Force Claim

We hold that the OAG has demonstrated a likelihood of success on the merits of most of the threat-of-force claims against defendant Thomas for his statement to escorts that they "could die from being shot by a bullet while on the sidewalk" following a Planned Parenthood shooting; his statement to escort program director Greenberg that "[s]omeone could pull a knife on you" shortly after a knife fight near Choices; and his statements to patients that the escorts "won't be here when you leave." *Griepp*, 2018 WL 3518527, at \*13-14, \*38 (quoting testimony). When viewed in context, these statements were objectively and subjectively threatening.

76

We do not reach our conclusions on this set of claims lightly. As the dissent points out, a protester's First Amendment right is valuable. Important, too, however, is the ability of a patient to seek reproductive health services without feeling endangered. Happily, we do not have to pioneer this balancing act. In concluding that certain statements constitute true threats, we rely on a plethora of law and focus only on the statements that would sound objectively threatening to a patient.

### 3. Force

Neither FACE nor NYSCAA define "force," but this Circuit has held in the context of a different federal statute that "force" broadly means "power, violence, or pressure directed against a person or thing." *Dickson v. Ashcroft*, 346 F.3d 44, 50 (2d Cir. 2003) (citation omitted). It is not limited to violent or assaultive force. *Id*. Because this definition accords with the common meaning of the term, we adopt this definition of "force" for FACE purposes.

The OAG argues that Exhibit 21, the only piece of evidence the district court considered, shows that force was used by the protestors. The district court stated, however, that while the video shows a collision between defendant LaLande and an escort, it is not clear who initiated contact. *Griepp*, 2018 WL

77

3518527, at *33. The district court said this was "quintessential incidental contact, because neither LaLande nor the escorts appear to be trying to create a collision. Rather, it appears that LaLande was trying to hand the patient a pamphlet while the escorts tried to block her access to the patient." *Id*. (citation omitted). As such, the conduct was not undertaken with the intent to injure, intimidate, or interfere. *Id*. We agree with the district court's ultimate conclusion for different reasons.

We disagree with the notion that incidental contact cannot rise to a FACE force violation. As the legislative history of FACE makes clear, the requirement that defendants "intentionally injure, intimidate, or interfere" means only that the defendant "intends to perform the act and is aware of the natural and probable consequences." S. Rep. No. 103-117, at 24 n.39. Under this definition of intent, incidental contact is not excluded from the statute's scope. For example, a protestor who reaches out to hand a patient a pamphlet and collides with the patient as a result will have intentionally interfered with, intimidated, or injured the patient, so long as: (1) the protestor intended to reach out; (2) the contact was the natural and probable result of reaching out; and (3) the protestor was aware that the contact was the natural and probable consequence of reaching out. That the interference, intimidation, or injury was a byproduct, rather than the goal, of

78

reaching out is thus not dispositive. Rather, intent turns upon whether a result was likely—that is, the natural and probable consequence—of a defendant's action and whether the defendant was aware of this.

This understanding of FACE's intent requirement accords with that of other Circuits as well. For instance, in *Dillard*, the Tenth Circuit addressed the defendant's argument that there was no evidence that she subjectively intended to injure, intimidate, or interfere with the provision of abortion services when she sent Dr. Means the letter that the court ultimately held was a threat of force. 795 F.3d at 1202-03. The defendant had repeatedly made statements that she did not approve of violence or intend to threaten Dr. Means or others. *Id*. at 1202-03. Though the Tenth Circuit acknowledged that there is a subjective intent requirement, it held that the relevant showing may be satisfied from the evidence of the act itself because "normally the actor is presumed to have intended the natural consequences of his deeds." *Id*. at 1202 (quoting *Washington v. Davis*, 426 U.S. 229, 253 (1976) (Stevens, J., concurring)). Because "the government ha[d] presented evidence from which a jury could reasonably find that [the d]efendant intentionally mailed Dr. Means a letter which contains a threat of violence," there

79

was evidence in *Dillard* "that [the defendant] subjectively intended the natural consequence of this act—intimidating Dr. Means by a threat of force." *Id*. at 1203.

Nonetheless, Exhibit 21 does not serve as evidence that defendant LaLande intentionally used force or attempted to do so. Though LaLande had stretched out her arm to hand a pamphlet to the patient, this act alone is not an intentional use of force. Stretching out her arm would only constitute force if LaLande was aware that the natural and probable consequence of this act is contact that interferes with, intimidates, or injures the escort. But it is unclear from the record who caused contact because both LaLande and the escort's actions occurred simultaneously. We cannot say that LaLande was aware that stretching out her arm would result in contact under these circumstances.

We conclude that the district court did not abuse its discretion in deciding that the OAG had not shown a likelihood of success on the merits of the force claim based on Exhibit 21.

### 4. Follow and Harass

The City Act, unlike FACE and NYSCAA, prohibits following and harassing another person within 15 feet of the premises of a reproductive health care facility. N.Y.C. Admin. Code § 10-1003(a)(3). While the City Act does not

define "harass," the legislative history indicates that the term "has its ordinary meaning . . . just as it does when used in the crime of 'harassment' in the State Penal Law" and cites to Penal Law Sections 240.25 and 240.26. N.Y.C. Comm. on Civil Rts. Rep. at 10 (Apr. 1, 2009). We accordingly look to these statutes.

First-degree harassment occurs when an individual "intentionally and repeatedly harasses another person by following such person in or about a public place or places or by engaging in a course of conduct or by repeatedly committing acts which places such person in reasonable fear of physical injury," N.Y. Penal Law § 240.25, and second-degree harassment occurs when a person "with intent to harass, annoy or alarm another . . . strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same; . . . follows a person in or about a public place or places; or . . . engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose," N.Y. Penal Law § 240.26. In analyzing the terms "intent to harass, annoy or alarm another" and "legitimate purpose," as relevant here, we are guided by state court precedent.

The intent to harass, annoy, or alarm another may be inferred from the conduct itself and the surrounding circumstances. *Shephard v. Ray*, 28 N.Y.S.3d 211, 212 (4th Dep't 2016). For example, intent was inferred in one case "from the sheer volume of defendant's attempted unwanted communications," especially after the police and victim asked the defendant to stop. *People v. Coveney*, 21 N.Y.S.3d 523, 527 (2d Dep't 2015). In *Coveney*, the victim was a principal at a school where the defendant had worked as a substitute teacher. *Id*. at 526. The defendant was fired because she was seen "screaming and yelling" in the school hallway after the victim told her that she could not interview for a full-time permanent position due to lack of experience. *Id*. The defendant sent the victim more than twenty letters to "get her job back." *Id*. The victim then asked the defendant to stop contacting her. *Id*. The defendant continued to write letters and began following the victim in public. *Id*.

With regard to the "no legitimate purpose" requirement, New York's highest court noted in a case involving the same requirement in a similar statute that conduct may lose its characterization as having a legitimate purpose if it continues after a request to cease has been made. This was the case in *People v. Shack*. 86 N.Y.2d 529, 533, 536-37 (1995). The defendant, who suffered from

82

mental illness, regularly spoke on the telephone with his cousin, a psychologist, from June through October of 1990 because he found it helpful for his mental health treatment. *Id*. Toward the end of October 1990, the cousin told the defendant that because he stopped taking medication, "she no longer welcomed his calls." *Id*. at 534. The defendant nonetheless continually called his cousin (185 times across approximately six months) after she "repeatedly advised him that she did not want to speak with him." *Id*. Rejecting the defendant's argument that he called her for a legitimate purpose because he sought help for his illness, the court said that "that argument addresses only those telephone calls placed before [the cousin] told him to stop calling her." *Id.* at 536.

Though *Coveney* and *Shack* involved conduct that spanned a longer timeframe and seemed particularly excessive, New York courts have found even less prolonged or extreme acts to constitute second-degree harassment. For instance, in *People v. Richards*, the court held that the defendant, who was attempting to sell a balloon, engaged in a course of conduct which would seriously annoy another person by "repeatedly blocking the path of a pedestrian, who was attempting to travel unmolested down the street with her two small children, and by refusing to accept her declination to purchase his balloon." 869

83

N.Y.S.2d 731, 739 (Crim. Ct. 2008). The court explained that "although [the defendant's] initial offer to engage in a commercial transaction may have served a legitimate purpose, his continuing to aggressively hawk his wares to an unwilling customer, eventually demanding that she 'Buy it for your kids!' did not." *Id.* As to intent, the court said that the defendant's intent could be inferred from the act itself or from the conduct and surrounding circumstances. *Id.*

As the district court recognized, the OAG provided undisputed evidence that Defendants have a deliberate policy and practice of following patients, companions, and escorts at extremely close distances and continuing to speak with these individuals after express and implied requests to stop. Defendant Griepp testified that after a patient directly tells him she does not want to hear what he has to say, he does not necessarily stop; instead, he assesses whether he could change topics and may press on. Defendant R. George also testified that he would keep speaking with patients who remain silent as they approach the clinic entrance and continues to engage patients who refuse literature. Though he will usually stop if a patient asks to be left alone, he sometimes makes a closing remark. Defendant Musco similarly makes a last appeal and offer of literature after being repudiated. There is also evidence that Church at the Rock protestors

84

often "tag team" patients: after one protestor stops speaking with a patient following a rebuff, another will subsequently try to engage the patient. *Griepp*, 2018 WL 3518527, at *46 (citation omitted). The second protestor sometimes, but not always, knows that the patient had previously rejected another protestor's attempts. The OAG also provided specific exhibits demonstrating alleged follow-and-harass violations.

The district court nonetheless held that neither Defendants' policy and practice of making multiple attempts to engage individuals, nor the specific exhibits, amounted to violations of the City Act's follow-and-harass prohibition. We disagree. We first discuss Defendants' practice and then the specific exhibits.

<u>Defendants' Policy and Practice of Making Multiple Attempts to Engage Individuals Following a Request to be Left Alone</u>

Taking the conduct and circumstances into account, it can be inferred that Defendants acted with the intent to harass, annoy, or alarm when they followed a patient, companion, or provider and made multiple attempts to engage that individual. The reproductive health context is a particularly delicate one. The decisions and beliefs that accompany visiting a reproductive health facility providing abortions like Choices are deeply personal. The process is oftentimes a

85

formidable or poignant one. Against this backdrop, protestors ignoring patient requests to be left alone and following patients at close distances while continually seeking to press their own ideals upon them may be intolerable. *See* S. Rep. No. 103-117, at 14-15 (noting the increased stress and anxiety patients feel because of protestor misconduct outside clinics). We accordingly hold that doing so sufficiently establishes an inference of intent to harass, annoy, or alarm. Indeed, less intrusive conduct has been considered second-degree harassment. *See Richards*, 869 N.Y.S.2d at 807.

It is inconsequential that protestors may have only sought to engage an individual for a short amount of time or following merely one rebuff. In the sensitive atmosphere of reproductive health care clinics, ignoring implicit or explicit requests to be left alone, even for a short time after a single rebuff, is egregious. Duration and quantity of attempts may cut against an inference of intent in less controversial situations, but we are not persuaded that they do so here.

Nor can we say Defendants had a legitimate purpose. That sidewalk counseling constitutes a legitimate First Amendment activity is irrelevant when the conduct at issue persists following a request to cease. *See Shack*, 86 N.Y.2d at

86

536; *Richards*, 869 N.Y.S.2d at 807. Defendants may have acted with a legitimate purpose in their first attempt to engage a patient, but once a patient makes an explicit or implicit request to be left alone, that legitimate purpose is vitiated.

Exhibit 135

In discussing the district court's treatment of the exhibits, we begin with Exhibit 135. The district court describes Exhibit 135 as "captur[ing] a woman's violent reaction to Joseph's overtures." *Griepp*, 2018 WL 3518527, at *47 Defendant Joseph had known that defendant Musco had already approached the woman and been rebuffed, but Joseph nonetheless made a second attempt to engage the woman. Joseph testified that she had asked the woman if she was all right or if she needed help. The district court did not infer the requisite intent because there was "insufficient evidence about what Joseph said to the woman and in what tone of voice to allow an inference that Joseph approached the woman with the intent to harass, annoy, or alarm her, rather than with an intent to engage the woman in conversation and persuade her not to seek an abortion or otherwise support Choices." *Id*.

We think there is sufficient evidence in Exhibit 135 by which to infer intent. Defendant Joseph sought to engage the woman despite being aware she

87

had already rebuffed another protestor. Though Joseph may only have asked her if she needed help, Joseph testified that "Ms. Pat had spoken to her prior, but then I figured okay, let me try to talk to her, maybe she'll be a little more receptive towards me." App'x at 1807. Therefore, Joseph herself acknowledged that she approached the patient in an attempt to continue dissuading her from entering the clinic. For the reasons described above, Joseph's subsequent attempt to engage the patient despite knowing that the patient had rejected another protestor's attempts is conduct from which we can infer intent. Nor does Joseph's purpose of seeking to persuade the woman not to support Choices preclude a finding that she acted with an intent to harass, annoy, or alarm. *See Coveney*, 21 N.Y.S.3d at 525 (discussing a defendant who acted with intent to harass, annoy, or alarm though her aim was to be rehired); *Shack*, 86 N.Y.2d at 533 (noting that the defendant acted with intent to harass, annoy, or alarm by calling the victim even though his goal was to seek mental health care); *Richards*, 869 N.Y.S.2d at 807 (concluding that the defendant acted with the requisite intent despite seeking to engage in a commercial transaction).

88

Exhibit 99

Exhibit 99 "shows [defendant] Thomas standing about six feet from an escort, pleading with her to look at a rubber fetus doll and attempting to explain to her why abortion is not acceptable in his view." *Griepp*, 2018 WL 3518527, at *16. Though the district court acknowledged that "Thomas was aware that the escort to whom he was talking exhibited body language suggesting that she was not interested in what he had to say," it concluded "the video does not show Thomas talking to the escort for so long, in such a tone, or in such a manner that it can be inferred that he did so with the intent to harass, annoy, or alarm." *Id*. at *47.

This conclusion is at odds with the video itself. Our review of the video shows that there are two escorts, one male and one female, and defendant Thomas is within one or two feet of the male escort. Ex. 99. Like the female escort, the male escort makes clear indications to Thomas that he is not interested in engaging with Thomas by continually turning away from Thomas. *Id*. Thomas nonetheless follows the escorts at a close distance while dangling the fetus doll. *Id*. Regardless of his tone or ultimate purpose, it is clear that Thomas is pestering the two escorts by continuing to pursue them in this manner. The cramped area

89

in which this all occurs, combined with Thomas's proximity to the escorts and the persistent manner in which he waves the fetus, gives rise to an inference of intent to harass, annoy, or alarm.

Exhibit 333

According to the district court, Exhibit 333 shows defendant "Thomas [taking] a few steps away from the patient in response to her requests that he '[b]ack up.'" *Griepp*, 2018 WL 3518527, at *37. The district court thus concluded that the interaction does not suggest Thomas had an intent to harass, annoy, or alarm. *Id*.

In our view, the factual finding that defendant Thomas backed away from the patient is clearly erroneous. Exhibit 333 depicts Thomas moving only to the side while the patient continues saying "back up" and holding out her hand to distance Thomas. Ex. 333. This speech and body language demonstrates that the patient does not want to converse with Thomas. Nevertheless, Thomas continues to speak to the patient. As such, for the reasons we have described above, Thomas's continued attempts to engage the patient is sufficient to give rise to an inference of impermissible intent.

90

Exhibits 3, 17, 338, 351, and 354

With Exhibits 3, 17, 338, and 351, we agree with the district court that because no audio of the interactions is captured, and because there are no hand gestures or body language exhibiting a desire to be left alone, there is insufficient evidence from which to infer intent.

"Exhibit 354 shows [defendant] Thomas attempting [to] persuade a patient's husband not to use the Clinic. At the start of the video, the husband was stationary, explaining to Thomas that his wife was at the Clinic because she had a miscarriage. Thomas attempted to persuade the man not to use the Clinic at all, because it perform[s] abortions." *Griepp*, 2018 WL 3518527, at *16 (citations omitted). In Exhibit 354, the man with whom Thomas engages "never asked to be left alone; he only said 'Okay,' in an exasperated tone. Even after saying that, the companion stopped to speak to Thomas for a second time." *Id*. at *48 (citations omitted). The district court concluded that nothing about the interaction suggests an intent to harass, annoy, or alarm. *Id*.

We agree with the district court. Although unambiguous body language may suffice to indicate that an individual no longer wishes to engage with a protestor, we are not convinced that the companion's actions here were so

91

unmistakable. We recognize that by using an exasperated tone, the companion implicitly suggested he would like defendant Thomas to leave him alone. But the companion's conduct in stopping to speak to Thomas a second time creates ambiguity as to whether the companion was rebuffing Thomas. We therefore do not disturb the district court's decision that intent cannot be inferred from Exhibit 354.

Conclusion on the OAG's Follow-and-Harass Claim

With regard to the City Act's follow-and-harass provision, we hold that a defendant's intent to harass, annoy or alarm may be inferred from the conduct of following a patient or companion at a reproductive health care facility and repeatedly attempting to engage that individual, even for a just a short time, when the individual explicitly or impliedly requested to be left alone. We accordingly hold that the OAG has demonstrated a likelihood of success on the merits of its follow-and-harass claims. We also note that the dissent, having concluded that the OAG may not sue under the City Act, does not counter this interpretation of the statute's follow-and-harass provision or its application.

92

### 5. Conclusion on the OAG's Likelihood of Succeeding on the Merits

"[FACE] is designed to protect health care providers and patients from violent attacks, blockades, threats of force, and related conduct intended to interfere with the exercise of the constitutional right to terminate pregnancy." S. Rep. No. 103-117, at 22. The statute is broad in order to shield this right. There is no statutory carveout for de minimis conduct. Even if such conduct is innocuous in other situations, given the health risks women needing reproductive care face because of the increased stress, anxiety, and agitation from protestor misconduct, the negative effects of de minimis conduct are amplified when dealing with reproductive health. *See id*. at 14-16. Therefore, it is not for us to rewrite and weaken FACE through narrow applications.

Thus, consonant with Congress's intent and drafting, and for the reasons set out above, we conclude that the OAG has sufficiently established it is likely to succeed on its FACE, NYSCAA, and City Act claims with respect to the physical obstruction, threat-of-force, and follow-and-harass allegations.

93

**B. Irreparable Harm**

Although the district court did conclude or assume that the OAG would likely succeed on the merits of three alleged violations,[13] the district court nonetheless denied injunctive relief because it determined that irreparable injury had not been shown.

Governmental plaintiffs may show irreparable harm by establishing "a reasonable likelihood that the wrong will be repeated." *Commodity Futures Trading Comm'n v. British Am. Commodity Options Corp.*, 560 F.2d 135, 141 (2d Cir. 1977). A likelihood of future violations may be inferred from past unlawful conduct, *Sec. & Exch. Comm'n v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100 (2d Cir. 1978), particularly when the defendant "maintain[s] that its activities were legitimate" and "persisted in [the violation] right up to the day of the hearing in the district court," *British Am. Commodity Options Corp.*, 560 F.2d at 142. Similarly, failing to attempt to cease or undo the effects of unlawful activity until the

---

[13] The district court assumed that defendant Musco's misleading of a patient by incorrectly telling her the clinic was closed and defendant Kaminsky's doing the same in a separate instance would violate the City Act. The district court held that defendant B. George's slow walk delay tactic violated FACE, NYSCAA, and the City Act.

institution of an investigation supports an expectation of future violations, as does willful, blatant, or outrageous violations. *Manor Nursing Ctrs., Inc.*, 458 F.2d at 1100. Thus, the "cessation of illegal activity does not ipso facto justify the denial of an injunction." *S.E.C. v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975). Instead, courts should look to the "totality of circumstances[] and factors suggesting that the infraction might not have been an isolated occurrence." *Id*.

The OAG argues that the district court erred in concluding that the violations at issue would not occur again. The district court rested its decision on B. George's supplemental declaration "swearing under oath that he engaged in the slow walk on only a handful of occasions, that he stopped doing so when [defendant] Griepp learned of the practice and told him to discontinue it, and that he 'will not engage in the behavior again.'" *Griepp*, 2018 WL 3518527, at *42. With defendants Musco and Kaminsky, the district court said they each had misled patients only once despite years of protest and that they "hav[e] been warned about the impropriety of such statements." *Id*. at *48.

These bases are insufficient to find no likelihood of future violations. Turning first to defendant B. George's slow walk, the OAG in our view satisfied its burden of showing a reasonable likelihood of reoccurrence. B. George's past

95

conduct gives rise to an inference of continued violations, *Manor Nursing Ctrs.*, 458 F.2d at 1100, an inference that is properly drawn in light of the following facts. First, B. George deliberately engaged in the delay tactic multiple times, and his slow walk constituted a blatant violation of the statutes.[14] The evidence at trial established that B. George purposefully "does the slow walk in front of the clients so Sharon and he can talk to them." App'x at 1860. Indeed, in response to the OAG's question of whether the slow walk was "a tactic that [B. George] uses to slow down patients who are entering the clinic," defendant Musco agreed and stated that "[i]t gives us a little more time to plead for the baby's life." App'x at 1860. Defendants also continue to maintain its legitimacy in their counter-appeal. These facts strongly support an inference of future violations. *British Am. Commodity Options Corp.*, 560 F.2d at 142; *Manor Nursing Ctrs.*, 458 F.2d at 1100-01.

Nor is defendant B. George's declaration enough to overcome this inference. As an initial point, B. George's affidavit is contradicted by the

---

[14] We affirm the district court's conclusion that the slow walk violates FACE, NYSCAA, and the City Act, set forth in our analysis more fully in section III.D, *infra*.

testimony; though B. George stated in his affidavit that he only engaged in the slow walk in "early 2017," the record, based on defendant Musco's notes, indicates that he did so as late as June 2017. App'x at 2187, 1860. This discrepancy casts doubt on the affidavit's credibility. *See Anderson*, 470 U.S. at 574-75. Moreover, we place heavy emphasis on the fact that this declaration was submitted *after* the preliminary injunction hearing and oral arguments had taken place. We cannot agree that such an eleventh-hour promise from an interested party is sufficient to refute an inference of future violations. *See Manor Nursing Ctrs.*, 458 F.2d at 1100; *cf. S.E.C. v. Bilzerian*, 29 F.3d 689, 695 (D.C. Cir. 1994) ("If a defendant could survive summary judgment by simply submitting a self-serving statement about his desire to conform to the law in the future, it would establish . . . a ritualistic dodge around a permanent injunction on a motion for summary judgment." (internal quotation marks omitted)). Concluding that the OAG has not shown irreparable harm solely based on B. George's declaration was an abuse of discretion.

The grounds for finding that defendants Musco and Kaminsky would not engage in future violations are even more tenuous. Though Musco and Kaminsky misled patients only one time each, they did so deliberately, and there

97

is no evidence that they disavowed doing so again until this litigation. These facts on the whole support an inference of continued violations. *See Manor Nursing Ctrs.*, 458 F.2d at 1100. The district court relied also on its belief that these defendants will not mislead patients again having been warned by the court. We fail to find any legal support for the proposition that reliance on such a belief can defeat a preliminary injunction. The district court therefore also erred in concluding that Musco and Kaminsky's violations would not reoccur on these grounds.

We conclude that, for those acts that the district court determined did constitute violations, the OAG has shown irreparable harm. We hold that the court's reliance on defendants B. George, Musco, and Kaminsky's self-serving statements, whether sworn or unsworn, that violations will not reoccur is an insufficient basis upon which to deny injunctive relief. Accordingly, we vacate the denial of the preliminary injunction and remand for further proceedings consistent with this opinion.

**III.    Defendants—Cross-Appellants' Claims**

Defendants raise a number of issues on cross-appeal. They argue that the OAG did not have parens patriae standing to enforce the City Act and that FACE

and its state and local analogs violate the First Amendment. Defendants also reassert their argument that the City Act's follow-and-harass provision is unconstitutionally vague, which was raised in their motion to dismiss but was not reached by the district court. Defendants include a vagueness challenge to the City Act's clinic interference provision, raised for the first time in their cross-appeal, as well. Finally, Defendants claim that the district court erred in concluding that B. George violated FACE and its analogs with his slow walk tactic.

**A. Jurisdiction**

Whether we have jurisdiction to hear the cross-appeal is not straightforward. Defendants' claims regarding the statutes' constitutionality and the OAG's standing to enforce the City Act were raised in their motions to dismiss below. While the district court never affirmatively denied the motions, it either did not decide or rejected these claims in its memorandum and order denying the OAG's motion for a preliminary injunction. Accordingly, there is no denial of the motions to dismiss from which Defendants might appeal. Defendants instead cross-appeal from the denial of the preliminary injunction

despite prevailing below. This raises both questions of subject-matter jurisdiction and Defendants' standing to cross-appeal.

We first take up subject-matter jurisdiction. We may address these claims by exercising our pendent appellate jurisdiction. Pendent appellate jurisdiction provides "jurisdiction over related rulings that are otherwise unappealable as long as the related rulings are 'inextricably intertwined' with an issue over which the court properly has appellate jurisdiction." *Blue Ridge Invs., L.L.C. v. Republic of Argentina*, 735 F.3d 72, 81 (2d Cir. 2013) (some internal quotation marks omitted). We conclude that the issues of whether FACE and its analogs are constitutional and whether the OAG has standing to enforce the City Act are "inextricably bound up with the preliminary injunction." *See Amador v. Andrews*, 655 F.3d 89, 95 (2d Cir. 2011) (citation omitted); *see also Lamar Advert. of Penn, LLC v. Town of Orchard Park*, 356 F.3d 365, 372 (2d Cir. 2004) (concluding that the issue of standing is "inextricably intertwined with the plaintiff's motion for preliminary injunction").

Although the district court did not decide whether the City Act's follow-and-harass and clinic-interference provisions are void for vagueness, we can and do elect to address this issue on appeal. "While generally we decline considering

100

arguments not addressed by the district court, this is a prudential rule we apply at our discretion. In determining whether to consider such issues, we rely on a number of factors, including the interests of judicial economy and whether the unaddressed issues present pure questions of law." *Bacolitsas v. 86th & 3rd Owner, LLC*, 702 F.3d 673, 681 (2d Cir. 2012) (citations omitted). Because remanding would be inefficient under these circumstances, and because the question of vagueness is a purely legal one, we opt to address the vagueness challenges on appeal.

We also note that Defendants retain standing to raise these claims and the argument that B. George did not violate FACE with his slow walk even though the district court entered an order favorable to Defendants. For a party to have standing on appeal, the party must generally be aggrieved by the judicial action from which it appeals. *Allstate Ins. Co. v. A.A. McNamara & Sons, Inc.*, 1 F.3d 133, 137 (2d Cir. 1993). However, one exception is when a "reversal revives the action against the appellees and renders [the appellees'] cross-appeal viable." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 341 n.7 (2d Cir. 2000). Two other considerations are relevant: whether "the record is sufficient for an appellate decision and whether a decision at the time would conserve judicial resources by

101

materially advancing the proceeding." *See Tr. for Certificate Holders of Merrill Lynch Mort. Inv'rs, Inc. Mort. Pass-Through Certificates, Series 1999-C1, ex rel. Orix Capital Mkts., LLC v. Love Funding Corp.*, 496 F.3d 171, 175 (2d Cir. 2007).

We conclude that Defendants have standing to pursue the cross-appeal based on these considerations. Our decision to vacate and remand the denial of the preliminary injunction "revives the action against appellees." *Parker*, 204 F.3d at 341 n.7. Additionally, these issues have been fully briefed by the parties, both on appeal and before the district court, and the district court has analyzed all but the vagueness claims. Therefore, a sufficient record exists on which to decide the issues, and judicial economy supports doing so. Accordingly, we turn to the merits of Defendants' claims.

**B. Constitutional Challenges**

Defendants raise two distinct constitutional challenges to the statutes. They first argue that FACE and its analogs violate the First Amendment. They next argue that the City Act's follow-and-harass and clinic-interference provisions are void for vagueness. Neither challenge is meritorious.

### 1. First Amendment Challenge

Defendants argue that FACE, NYSCAA, and the City Act are facially unconstitutional because they are aimed at speech about reproductive health services. But our precedent directly rejects Defendants' contention. In *United States v. Weslin*, 156 F.3d 292, 296-98 (2d Cir. 1998), our Circuit held that FACE was facially neutral and constitutional. We first noted that FACE largely regulates obstructive conduct and only proscribes speech insofar as it prohibits true threats, which fall outside of the First Amendment's ambit. *Id*. at 297. We went on to explain that regardless, the statute is content-neutral because "FACE applies *whenever* access to reproductive health services is obstructed. It contains no requirement whatsoever that the offenders intend to communicate a particular message—or any message at all—by their obstructive actions." *Id*. To exemplify this, we cited to the Eighth Circuit's observation that "FACE would prohibit striking employees from obstructing access to a clinic in order to stop women from getting abortions, even if the workers were carrying signs that said, 'We are underpaid!' rather than 'Abortion is wrong!'" *Id*. (some internal quotation marks omitted).

103

Defendants attempt to overcome *Weslin* by arguing that the Supreme

Court's subsequent decision in *Reed v. Town of Gilbert* calls *Weslin* into question.

576 U.S. 155, 159 (2015). We disagree. In *Reed*, the Supreme Court held that a

municipal code's regulation of the display of outdoor signs was a content-based

regulation because the restrictions "depend entirely on the communicative

content of the sign." *Id*. at 164. But in *Weslin*, we explicitly held that application

of FACE does *not* rely on any particular message or communicative content. 156

F.3d at 297. Speech and conduct unrelated to reproductive rights can still give

rise to a FACE violation. *Id*. Accordingly, *Reed* is inapposite.

We also note that the dissent agrees that FACE and NYSCAA are

constitutional. Because it does not reach the City Act claims, the dissent does not

argue against our affirmance of the district court's conclusion that all three

statutes do not violate the First Amendment. *See Griepp*, 2018 WL 3518527, at \*29

n.18.

### 2. Vagueness Challenges

Defendants also argue that the follow-and-harass and clinic-interference

provisions of the City Act are void for vagueness. The "void for vagueness"

doctrine requires that laws be sufficiently clear to give a person of ordinary

104

intelligence a reasonable opportunity to know what is prohibited; laws may also be unconstitutionally vague if they allow for arbitrary and discriminatory enforcement. *VIP of Berlin, LLC v. Berlin*, 593 F.3d 179, 186 (2d Cir. 2010). In assessing whether a statute is vague, we may properly rely on a statute's legislative history if necessary. *See Commack Self-Service Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 213 (2d Cir. 2012).

Defendants challenge the follow-and-harass provision of the City Act on vagueness grounds because "harass" is not defined in the City Act. But as we explained when discussing the Attorney General's likelihood of success on the merits of its follow-and-harass claims, the legislative history makes clear that "harass" incorporates the definition of harassment in the criminal code. *See* N.Y.C. Comm. on Civil Rts. Rep. at 10 (Apr. 1, 2009). This definition is further explored in multiple New York state judicial opinions, as discussed above. In light of this, we cannot say that a person of ordinary intelligence would not understand what is prohibited or that arbitrary and discriminatory enforcement

would result. Therefore, we reject Defendants' argument that the City Act's follow-and-harass provision is void for vagueness.[15]

---

[15] Defendants argue that New York's criminal harassment statutes are themselves constitutionally defective, so they cannot be relied upon to supply a definition for "harass" in the City Act. Defendants claim the criminal harassment statutes are content-based statutes because they "shall not apply to activities regulated by the national labor relations act, as amended, the railway labor act, as amended, or the federal employment labor management act, as amended." N.Y. Penal Law §§ 240.25, 240.26. We do not read the quoted language to serve as subject-matter carveouts such that the statutes are content based; rather, the quoted language merely acknowledges federal preemption.

Legislatures are prohibited "from discriminating in the regulation of expression on the basis of the content of that expression," *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2346 (2020) (internal quotation marks omitted), but New York does not do that here. New York cannot, as a matter of law, regulate activities that are already regulated by the above-referenced federal laws. *See, e.g., Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220-21 (2d Cir. 2008) (noting that state law is preempted when "Congress intend[s] the Federal Government to occupy a field exclusively, or when state law actually conflicts with federal law" (brackets and internal quotation marks omitted)); *see also Pruter v. Local 210's Pension Tr. Fund*, 858 F.3d 753, 759 (2d Cir. 2017) ("The [Railway Labor Act] preempts potentially conflicting state causes of action even if the state law does not actually conflict with the federal law and regardless of the nature of the state law claim . . . ."); *Healthcare Ass'n of N.Y. State, Inc. v. Pataki*, 471 F.3d 87, 95 (2d Cir. 2006) ("States may not regulate activity that the [National Labor Relations Act] protects, prohibits, or arguably protects or prohibits." (quoting *Wis. Dep't of Indus., Labor & Human Relations v. Gould, Inc.*, 475 U.S. 282, 286 (1986))). Thus, the above-quoted language serves simply as a recognition that activities regulated by the federal government are protected from the state's reach. It is not, as Defendants argue, an attempt to "single[] out specific subject matter for differential treatment." *Am. Ass'n of Pol. Consultants*, 140 S. Ct. at 2346 (quoting *Reed*, 576 U.S. at 169).

106

Similarly, "interfere" is not defined in the City Act, so Defendants argue that the clinic-interference provision is void for vagueness. While "interfere" is not defined in the legislative history either, we do not believe the clinic-interference provision is unconstitutionally vague. Based on the plain meaning of that term, a person of ordinary intelligence would understand what it means to "interfere." In addition, the provision prohibits "knowingly" interfering, and this scienter requirement further undermines vagueness concerns. *See Einaugler v. Supreme Court of State of N.Y.*, 109 F.3d 836, 842 (2d Cir. 1997). For these reasons, we reject Defendants' argument that the clinic-interference provision is void for vagueness.[16]

**C. Standing**

Defendants next argue that the OAG lacks parens patriae standing to enforce the City Act. "The doctrine of *parens patriae* allows states to bring suit on behalf of their citizens in certain circumstances by asserting a quasi-sovereign

---

[16] The dissent, having concluded that it does not need to address the City Act claims, does not counter our holding that neither the follow-and-harass provision nor clinic-interference provision of the City Act are unconstitutionally vague.

interest." *Connecticut v. Physicians Health Servs. of Conn., Inc.*, 287 F.3d 110, 119 (2d Cir. 2002) ("*Physicians II*").

Here, the City Act does not explicitly provide for parens patriae standing. However, this is not fatal to the OAG's standing. Typically, when determining whether a state has parens patriae standing to enforce a statute, one question we ask is whether the statute in question excludes the possibility for parens patriae standing. *Id*. at 120. "States have frequently been allowed to sue in *parens patriae* to enforce federal statutes that do not specifically provide standing for state attorney generals." *Id*. at 121 (citation and alterations omitted). This is especially true in statutory schemes that have broad enforcement provisions, using words like "any person" or "the party so injured or deprived" to describe the category of entities eligible to sue. *Connecticut v. Physicians Health Servs. of Conn.*, 103 F. Supp. 2d 495, 509-10 (D. Conn. 2000) ("*Physicians I*") (emphasis omitted) (collecting examples). In *Physicians II*, although we concluded that Section 1123(a)(3) of the Employee Retirement Income Security Act ("ERISA") was specifically structured to "strictly limit[] the universe of plaintiffs who may bring certain civil actions," we acknowledged that was in large part due to language indicating that "a participant, beneficiary, or fiduciary" may bring civil suit.

*Physicians II*, 287 F.3d at 120-21 (quoting 29 U.S.C. § 1132(a)(3)). In that holding, we carefully noted that we did "not of course intend to imply that states may only sue in their *parens patriae* capacity when a statute specifically provides for suits by states." *Id.* at 121. In other words, where broadly inclusive phrases like "any person" are used, parens patriae power is not foreclosed. *See Physicians I*, 103 F. Supp. 2d at 509-10 (collecting examples). Similarly, in *Clearing House Association, L.L.C. v. Cuomo*, we declined to hold that the OAG lacked parens patriae standing under the Fair Housing Act's ("FHA") "broad remedial provision that allows any 'aggrieved person' to bring an action," 510 F.3d 105, 125 (2d Cir. 2007), *aff'd in part and rev'd in part on other grounds*, 557 U.S. 519 (2009), even though the FHA defines "[p]erson" in a similar fashion as the City Act, 42 U.S.C. § 3206(d); *see also, e.g., Support Ministries for Persons with AIDS, Inc. v. Village of Waterford*, 799 F. Supp. 272, 275-79 (N.D.N.Y. 1992) (New York had standing to sue in parens patriae under the FHA). Nowhere in that definition is an explicit reference to governmental entities, and indeed, the FHA's definition even lacks the catch-all phrase "any other entity" contained in the City Act, discussed below. *See* 42 U.S.C. § 3602(d); *see also* N.Y.C. Admin. Code § 10-1002.

109

Yet, we suggested (albeit without deciding) that the OAG could bring a parens patriae action under the FHA. *See Clearing House*, 510 F.3d at 125-26.

Here, the City Act's enforcement provision is broad enough to allow for parens patriae standing even absent a specific statutory authorization. The City Act's enforcement provision states that "*any person* whose ability to access a reproductive health care facility has been interfered with, and *any owner or operator* of a reproductive health care facility or owner of a building in which such a facility is located, may bring a civil action" for violation of the Act. N.Y.C. Admin. Code § 10-1004 (emphases added). This broad civil enforcement provision is similar in scope to others that allow for parens patriae standing. In *People by Abrams v. 11 Cornwell Co.*, we held that New York had standing to sue as parens patriae for violations of 42 U.S.C. § 1985, which allows for "the party so injured or deprived" to recover damages. 695 F.2d 34, 38, 40 (2d Cir. 1982), *vacated in part on other grounds*, 718 F.2d 22 (2d Cir. 1983). The City Act's enforcement provision similarly allows enforcement by anyone injured by the prohibited conduct, whether the injured is someone whose access was interfered with, or the owner or operator of a harmed clinic, or the owner of a building housing a clinic that has suffered.

Moreover, the City Act defines "person" very broadly, including "an individual, corporation, not-for-profit organization, partnership, association, group or *any other entity*." N.Y.C. Admin. Code § 10-1002 (emphasis added). Although "person" does not explicitly list a state government, it includes virtually *any* entity within its scope. The word "person", in turn, is used in the operative Section 10-1004 discussed above. This residual-clause approach to defining "person" evinces an intent to be inclusive, rather than exclusive, when providing civil standing.

The City Act does not include any of the restrictive terminology used in other statutes to restrict enforcement standing. *Compare Physicians II*, 287 F.3d at 120-21, *with* N.Y.C. Admin. Code § 10-1004. By way of example, Section 1985 does not define the term "party" used therein, and it is not altogether clear that state governments fit within the term based on the surrounding language. 42 U.S.C. § 1985(3). Nonetheless, states may sue as parens patriae for violations of it. *See 11 Cornwell Co.*, 695 F.3d at 40. The dissent takes issue with the application of this analogous analysis. True, the statutory text and context are not identical, since we have not previously evaluated this question with regard to the City Act. However, it is not as if a completely different set of statutory interpretation rules

111

apply to municipal codes that use nearly identical language as some federal statutes. We have used the interpretation of federal statutes "with similar wording" to inform our understanding of state and municipal statutes. *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (citation omitted) (referring to New York City Human Rights Law). In any event, the underlying reasoning for our interpretation and application of parens patriae standing exists here: where broad civil enforcement provisions like this one exist, with no apparent limitation on the category of party, parens patriae standing is not foreclosed, given, of course, that the other requirements are satisfied, which we discuss in detail below. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607-08 (1982). Accordingly, the lack of a specific reference to state government standing within the City Act is not fatal to parens patriae standing.

Having established that the City Act permits parens patriae standing, we next turn to the question of whether the OAG has shown that the three requirements for such standing have been met in the present case. These three requirements are: (1) injury to a sufficiently substantial segment of the state's population; (2) a quasi-sovereign interest; and (3) an inability for individual

112

plaintiffs to obtain complete relief. *See 11 Cornwell Co.*, 695 F.2d at 38-40. The OAG has satisfied all three.

The OAG has adequately alleged that Defendants' conduct harms a substantial segment of the population. First, the OAG alleged that since Choices' opening, Defendants have engaged in intimidating and harassing conduct directed towards multiple groups of people, including Choices staff and volunteers, prospective and current patients, and patients' companions. Second, because Choices provides a range of reproductive health care services, the patients affected are not just those seeking abortions. Third, Choices serves all women in the New York City area. Thus, the scope of persons injured is broader than it may seem. We also note that New York State enacted its own version of FACE, and "[o]ne helpful indication in determining whether an alleged injury to the health and welfare of its citizens suffices to give the State standing to sue as *parens patriae* is whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers." *Alfred L. Snapp & Son*, 458 U.S. at 607. Therefore, the OAG has satisfied the first requirement.

The OAG has also shown that the State has a quasi-sovereign interest "apart from the interests of particular private parties." *Id*. Courts routinely

113

acknowledge that "a State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general." *Id*. Because protest activity outside healthcare facilities "threatens not only the psychological, but also the physical, well-being of the patient[s]" seeking treatment, a state would naturally have a quasi-sovereign interest in preventing any interference with patients' access to reproductive health care facilities resulting from protests. *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 768 (1994). Accordingly, this second requirement is also satisfied in the present case.

Finally, the OAG has also satisfied the requirement that individual plaintiffs be unable to obtain complete relief. We have held that when it is "difficult and costly" to litigate claims, and when the interests of individuals "are not necessarily coextensive with those of the public," private parties may be unable to obtain complete relief. *Commonwealth of Puerto Rico ex rel. Quiros v. Bramkamp*, 654 F.2d 212, 217 (2d Cir. 1987). Both characteristics are presented here. "There is no assurance that the [individuals affected] could bear the cost of a lawsuit that would achieve complete relief." *Id*. For one, the OAG's suit was the product of a year-long investigation into Defendants' activities, and there is no evidence that any individual would have had the resources required to

undertake such an extensive investigation or any subsequent litigation.

Additionally, because individual plaintiffs may be more willing to opt for monetary relief over injunctive relief or settle their claims, "there is no assurance that all named defendants herein would be sued or that relief against widespread and future [violations] would be actively pursued." *Id*. Furthermore, as the district court identified, individual plaintiffs may be unwilling to bring suit due to the heightened privacy concerns that accompany the reproductive health care context. Thus, the OAG has sufficiently demonstrated the inability of individual plaintiffs to obtain complete relief.

All three requirements for parens patriae standing have been satisfied in this case. We therefore affirm the district court's conclusion that the OAG has standing to pursue its claims under the City Act.[17]

---

[17] The dissent suggests the Supreme Court has "recently" expressed caution regarding the interpretation of clauses conferring rights to sue. Dissenting Op. at 9. The cited 2011 case was context-specific and nowhere mentions the doctrine of parens patriae. *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176 (2011) (explaining that "the Title VII aggrievement requirement" does not necessarily confer a "right to sue on all who satisfied Article III standing"). In any event, the City Act is a state statute. The Supreme Court's urging caution with respect to federal statutes is neither here nor there.

**D. B. George's Slow Walk**

The district court found that defendant B. George engaged in a "purposeful 'slow walk' in front of patients" on three occasions in 2017 in order to "delay the patients' access to Choices and thereby provide more time for protestors to speak with the patients and hand them literature." *Griepp*, 2018 WL 3518527, at *42. The district court concluded that in doing so, B. George violated FACE, NYSCAA, and the Clinic Act by physically obstructing the patients' access. *Id*. The district court relied on *Operation Rescue*, 273 F.3d at 195, in which a defendant violated FACE through physical obstruction by slowing access to the clinic parking lot with a tactic that involved "dropping an item on the ground and then retrieving it in slow motion." *See Griepp*, 2018 WL 3518527, at *42 (quoting *Operation Rescue*, 273 F.3d at 195).

Defendants contend that the district court erred in coming to this conclusion. They argue that there is no evidence that defendant B. George rendered access impassable or unreasonably difficult or dangerous, nor did he actually delay anyone at all. Defendants claim that patients could have walked around B. George, and causing a slight deviation in course or a brief delay does not amount to obstruction.

116

We agree with the district court that defendant B. George's slow walk was physical obstruction in violation of FACE and its analogs. As the district court noted, *Operation Rescue* held that slowing access, whether by dropping items and retrieving them in slow motion or by "using [one's] body to slow moving cars and pushing literature and pamphlets through car windows" constitutes physical obstruction. *Operation Rescue*, 273 F.3d at 195. B. George's conduct is similar. B. George used his body to hinder access to Choices by purposefully walking slowly in front of patients. He did so to provide himself and his fellow protestors more time to "appeal for the baby." App'x at 1860. Therefore, like the defendant in *Operation Rescue*, B. George intentionally interfered with patients' access to Choices through physical obstruction.

Defendants' counterarguments to the district court's analysis are unavailing. As we have said earlier in this opinion, even short delays that force patients to walk around a protestor can make access unreasonably difficult or dangerous, especially when viewed in the cramped, crowded context of the area outside Choices. In any event, the OAG does not need to prove that defendant B. George actually delayed anyone. Attempting to do so can still constitute physical obstruction. *See Mahoney*, 247 F.3d at 284 (concluding that the defendant engaged

117

in physical obstruction by kneeling in front of an emergency exit door even though he did not actually block anyone from exiting). We affirm the district court's conclusion that the OAG would likely succeed on the merits of its claim that defendant B. George physically obstructed patients by engaging in a slow walk delay tactic.

**CONCLUSION**

We conclude as follows. Though the district court did not clearly err in its credibility determinations as to the OAG's witnesses, these inferences do not support the district court's finding that the documentary evidence was categorically unreliable. The district court therefore erred in failing to give any weight to this evidence. This error, as it relates to the Recaps, was not harmless.

The district court also erred in applying FACE, NYSCAA, and the City Act to portions of the challenged conduct in its preliminary injunction analysis and in assessing irreparable harm. As relevant to the OAG's likelihood of success on the merits, we hold that FACE and its analogs proscribe delaying patients without requiring a significantly long delay, crowding patients directly or indirectly with bodies or signs, and touching or leaning into the windows and doors of cars exiting a facility. As discussed in detail above, we also disagree

118

with the district court's conclusions regarding some of the speech at issue, which we categorize as true threats. Furthermore, specific to the City Act, a defendant's intent to harass, annoy, or alarm may be inferred from the conduct of following a patient or companion at a reproductive health care facility and making multiple attempts to engage that individual, even for a short time, when the individual explicitly or implicitly requested to be left alone. Finally, we find that the district court erred in its conclusions on irreparable harm.

As to the cross-appeal, we affirm the district court's conclusion that the statutes are facially constitutional. We hold that the City Act's follow-and-harass and clinic-interference provisions are not void for vagueness. We also affirm the district court's holdings that the OAG has parens patriae standing to bring claims under the City Act and that defendant B. George engaged in physical obstruction through use of his slow walk delay tactic.

Accordingly, we vacate in part, affirm in part, and remand for further proceedings consistent with this opinion.

GUIDO CALABRESI, *Circuit Judge*, concurring:

I join the majority opinion in full.  There are powerful, conflicting values at stake in this case.  And we must balance those values carefully.  The majority opinion does just that.  It decides, in part, in favor of anti-abortion protesters and, in part, in favor of the State on behalf of abortion clinics and patients.  It does so on the basis of a painstaking analysis of the law and the facts.  Such analysis is what we ought to undertake in cases like this.

I write separately because, frankly, I do not understand the partial dissent's position with the respect to the New York City Access to Reproductive Health Care Facilities Act ("City Act").  The dissent would conclude—contrary to the majority; to the district court; to the appellant, the State of New York; and to *amicus curiae*, the City of New York—that the State may not sue under the City Act.  That position, to me, raises an obvious problem, one that goes to federal-state relations.

The partial dissent, in reaching the conclusion that the State may not sue under the City Act, relies on federal court interpretations of federal statutes.  The majority, in reaching the opposite conclusion, relies on these sources too.  But the City Act is a state statute.  That is so because the City is a creature of the State.

Therefore, the question of whether the State may sue under the Act, like the question of what conduct the Act prohibits, is purely a matter of state law.

The State likely may sue under the City Act. But I must say that that conclusion is uncertain. And I cannot understand how one can say with certainty that the State may not sue under the Act.

In situations where the meaning of a state statute is uncertain, it is usually appropriate to certify the question to the state's highest court. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Mallela*, 372 F.3d 500, 505 (2d Cir. 2004) (certification appropriate where state law is unclear and state courts have not had an opportunity to interpret it, where an unsettled question of state law raises important issues of public policy, and where the question is likely to recur); *Allstate Ins. Co. v. Serio*, 261 F.3d 143, 150–53 (2d Cir. 2001) (certification appropriate where a state court's interpretation of a state statute might avoid federal constitutional questions); *see also McKesson v. Doe*, 141 S. Ct. 48, 50–51 (2020) (same). I believe that the uncertainty here strongly supports such certification.

There are reasons, however, why certification by the majority may well be inappropriate. The principal reason is that the majority remands to the district

2

court for reconsideration of injunctive relief on any number of grounds, including the application of the federal Freedom of Access to Clinic Entrances Act ("FACE") and the New York State Clinic Access Act ("State Act"). Hence, it is hard to say that the majority's result depends on the State's ability to sue under the City Act. And, if it does not, certification would run afoul of New York's rule that only "determinative" questions of New York law may be certified. N.Y. CONST. art. VI, § 3(9); N.Y. COMP. CODES R. & REGS. tit. 22, § 500.27(a).

A second reason why certification by the majority might not be appropriate is that, while this case is pending, no injunction will issue. Therefore, to the extent timing is important, as it usually is when a party seeks preliminary relief, further delay might be undesirable. For this reason, too, but primarily for the reason that the State's authority to sue under the City Act might not be determinative, I am—reluctantly—willing to forgo certification. But I remain of the opinion that important questions in this case, namely, whether the State may sue under the City Act and, if so, what conduct the City Act prohibits, properly belong to the New York Court of Appeals and not the United States Court of Appeals.

Neither of the reasons why certification is inappropriate as to the majority applies to the dissent. The dissent would deny an injunction on the basis of FACE and the State Act, even though it agrees that some violations of those statutes occurred. On that view, it is fairly obvious that, because the City Act's prohibitions are broader than those of FACE and the State Act, the question of whether an injunction lies depends on the City Act. For the dissent, then, whether the State may sue under the City Act, and what conduct the City Act prohibits, are appropriate questions for certification.

Moreover, the issue of timing, from the dissent's point of view, can be no impediment. Again, the dissent would deny an injunction. And hence delay in resolving whether an injunction should issue is no excuse. Such delay would preserve the status quo, which the dissent favors.

In raising this problem, I do not mean to detract from the spirited disagreement between the majority and dissent over the weighty values at stake in this case. Far from it. But I believe that the disagreement might be better resolved if we had a clearer understanding of what the City Act permits.

4

DEBRA ANN LIVINGSTON, *Chief Judge*, concurring in part and dissenting in part:

Early on Saturday mornings, from about 6:30 a.m. to 10:00 a.m., congregants from Church at the Rock, Grace Baptist Church, and Helpers of God's Precious Infants, along with various other individuals, gather outside of Choices Medical Center ("Choices" or "Clinic") in Queens, New York. Standing near the entrance or walking along the public sidewalk around the facility, they attempt to dissuade people from visiting the Clinic which, among other things, performs abortions. In response to this activity, the Clinic has long operated a formal escort program on Saturday mornings, so that volunteer escorts, who typically place themselves on each side of a visitor, "greet and walk patients down the sidewalk to the Choices entrance." *New York ex rel. Underwood v. Griepp*, No. 17-CV-3706, 2018 WL 3518527, at *4 (E.D.N.Y. July 20, 2018). "On a typical Saturday, there are two to three dozen protestors and escorts, with the escorts often outnumbering the protestors two to one." [1] *Id.* at *3.

---

[1] The district court described the individuals who gather on Saturday morning outside Choices as "protestors," and so do I. But as in *McCullen v. Coakley*, 573 U.S. 464 (2014), the individuals here engage in a range of activity, "expressing their moral or religious opposition to abortion through signs and chants," but also seeking "not merely to express their opposition to abortion, but to inform women of various alternatives and to provide help in pursuing them." *Id.* at 472, 489. The defendants thus described some of their work as seeking "consensual conversation" to let "women who are abortion-minded . . . know that there are other choices and that we will help them with

1

Protesters had been appearing outside Choices on Saturday mornings for some four years before the New York State Attorney General ("OAG") initiated the investigation into their conduct that resulted in the present case. *Id.* at *1, *4. Then, for over a year, the OAG operated a high-mounted surveillance camera, employed undercover investigators, and outfitted two Clinic escorts with hidden recording devices to document protester activities. *Id.* at *4–5. Based on information collected through this lengthy surveillance, the OAG filed a complaint alleging numerous purported violations of federal, state, and local clinic access laws. The district court—after hearing seventeen witnesses testify over fourteen days, reviewing hundreds of pages of documentary evidence, watching dozens of videos, and holding oral argument—found, in a magisterial 100-page opinion, that all but three of the incidents identified by the OAG likely did not violate the law and, of the three that did, none were likely to recur. I can discern no error, much less an abuse of discretion, in any of these painstaking factual determinations, nor in the careful legal analysis underlying them. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) ("If the district court's account of the evidence is

---

that baby." App'x 1830 (testimony of Pat Musco).

2

plausible in light of the record viewed in its entirety, the court of appeals may not

reverse it . . . .").

The majority, in contrast, sets aside both many of the district court's well-

supported factual findings and its legal conclusions—although, even with its

flawed analysis, the majority cannot disturb *all* of the court's work.[2]   In doing so,

---

[2] As to the OAG's appeal, I agree with the majority insofar as it concludes that (a) any purported error in the district court's failure to consider the Protester Experience Questionnaires was harmless; (b) the district court's credibility determinations were not clearly erroneous; (c) Exhibits 7, 31, 39, 41, 49B, 55, and 102 do not demonstrate physical obstruction; (d) Ranville Thomas's statements to Mary Lou Greenberg and Ronald George's statements to escorts were not true threats; and (e) Exhibit 21 does not demonstrate that the OAG is likely to succeed on its claim that Jasmine LaLande violated the statutes by using force against an escort with whom she collided.

I specifically do not concur in the majority's *reasoning* with regard to the last of these conclusions, however, which misconstrues the intent element in the federal and state statutes at issue.   In relevant part, these statutes provide for penalties where a defendant, by force, threat of force, or physical obstruction, "intentionally injures, intimidates, or interferes with [another person], or attempts to [do the same]," because that person is or has been "obtaining or providing reproductive services."   18 U.S.C. § 248(a)(1); N.Y. Penal Law § 240.70(1)(a).   "In ordinary English, where a transitive verb has an object, listeners in most contexts assume that an adverb (such as [intentionally]) that modifies the transitive verb tells the listener how the subject performed the entire action."   *Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009).   Thus, the intent requirement here is not merely intending the physical act but acting with the specific intent to injure, intimidate, or interfere.   *See Sharpe v. Conole*, 386 F.3d 482, 484 (2d Cir. 2004) ("The intent to injure, intimidate, or interfere is a separate intent requirement that must . . . be proved by a FACE Act plaintiff."); *Norton v. Ashcroft*, 298 F.3d 547, 554 (6th Cir. 2002) (noting that FACE "is a specific intent statute" and that "application of the Act depends . . . on specific facts demonstrating that plaintiffs acted with the requisite specific intent"); *United States v. Mahoney*, 247 F.3d 279, 283–84 (D.C. Cir. 2001) (upholding district court's determination that FACE defendant acted with "requisite specific intent").

the majority neglects the deferential standard of review that ought to govern and enunciates novel propositions of law that upend the delicate accommodation that the federal, state, and local legislatures sought to achieve in the Federal Access to Clinic Entrances ("FACE") Act, the New York State Clinic Access Act ("State Act"), and the New York City Access to Reproductive Health Care Facilities Act ("City Act"). There is no justification in this record for the treatment afforded the district court's factual and legal analysis, particularly at the expense of "the most fundamental of constitutional values"—"[t]he freedom to speak." *In re Application of The Herald Co.*, 734 F.2d 93, 100 (2d Cir. 1984). Except with regard to the specific conclusions noted herein, I respectfully dissent.

## I. Cause of Action under the City Act

The OAG appeals the denial of the preliminary injunction, but I begin with the cross appeal, which asserts, at the start, that the OAG may not bring an action to enforce the City Act.[3] This is the one point addressed herein on which I reach

---

[3] Although the cross appeal refers to this as a "standing" issue, we have since clarified that "what has been called 'statutory standing' in fact is not a standing issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute.'" *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (quoting *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014)). As to the rest of the cross appeal, I concur in (a) the majority's determination that we have jurisdiction to hear and Defendants have standing to bring the cross appeal; (b) under our precedents, Brian George's "slow walk" amounts to physical obstruction; and (c) the

4

a different conclusion than the district court. The inquiry into whether the OAG may sue under the City Act has two parts. First, the City Act must contain "a statutory endorsement of the action." *Kendall v. Emps. Ret. Plan of Avon Prods.*, 561 F.3d 112, 118 (2d Cir. 2009); *see also Am. Psychiatric Ass'n*, 821 F.3d at 359. Second, the OAG must satisfy the requirements of *parens patriae* standing. The district court analyzed only the second of these two parts. But the first is a necessary antecedent as "plaintiffs [must] fall 'within the class of plaintiffs . . . authorized to sue.'" *Am. Psychiatric Ass'n*, 821 F.3d at 360 (quoting *Lexmark Intern., Inc.*, 572 U.S. at 128).

The majority addresses the missing first step but concludes, erroneously, that the City Act is sufficiently broad to allow enforcement by the OAG because it allows for enforcement by "*any person* whose ability to access a reproductive health care facility has been interfered with." N.Y.C. Admin. Code § 10-1004 (emphasis added). The majority concedes that the City Act "does not explicitly list a state government" in defining "person." Majority Opinion ("Maj. Op.") 111. It

---

FACE Act and the State Act are constitutional. Given my determination that the OAG may not sue to enforce the City Act, I need not address the Defendants' claim that the City Act's follow-and-harass and clinic-interference provisions are void for vagueness, nor any other claims regarding that Act's application.

5

nonetheless concludes that the OAG can sue because broad terms like "party" encompass State entities in other contexts. But this analysis is flawed because it ignores the City Act's text and structure, not to mention traditional tools of statutory interpretation.

Beginning with the text, the City Act defines "person" as "an individual, corporation, not-for-profit organization, partnership, association, group or any other entity." N.Y.C. Admin. Code § 10-1002. The OAG contends that this provision authorizes it to sue. But absent from this list is any reference to the State, a State agency or, indeed, any governmental body. There is no reason to presume that this absence was not by intentional design, moreover, as the City Council has shown through other provisions of the New York City Administrative Code that "[w]here [it] intends to refer" to the State, a State agency, or to governmental bodies generally, "it knows how to do so." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 476 (2003); *see e.g.*, N.Y.C. Admin Code § 8-102 (N.Y.C. Human Rights Law) ("'Person' includes . . . partnerships, associations, organizations, *governmental bodies or agencies*, corporations, . . . ." (emphasis added)). It has "thus demonstrated in [another statute] that it [knows] how to provide" for a state agency to bring suit, but has not used such language here.

6

*Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485 (1996); *see also New York v. Mountain Tobacco Co.*, 942 F.3d 536, 549 (2d Cir. 2019).

The conclusion that the OAG is not authorized to bring suit is only reinforced by consideration of the City Act as a whole. First, the Act *expressly* provides for enforcement by a *different* government entity: the City's Corporation Counsel. N.Y.C. Admin. Code § 10-1005. Second, the Corporation Counsel may seek only injunctive relief pursuant to the City Act.[4] *Id.* Construing the general provision to allow for enforcement by government entities like the OAG or the Corporation Counsel would render Section 10-1005 superfluous, violating a fundamental canon of statutory construction. *See, e.g., Yates v. United States*, 574 U.S. 528, 543 (2015) ("We resist a reading of [a statutory provision] that would render superfluous an entire provision passed in proximity as part of the same Act."). And to put it mildly, it would be unusual for the City to accord the State Attorney General broader enforcement powers than its own Corporation Counsel, yet that is precisely what the OAG contends the City Act does.

---

[4] Conversely, the general enforcement provision upon which the OAG relies provides for injunctive relief, treble damages, and attorneys' fees. *Id.* § 10-1004.

7

Alternatively, the OAG argues that its ability to enforce the City Act derives from the following subsection: "This Chapter [of the City Act] does not limit the lawful exercise of authority vested in . . . a law enforcement officer of the city, the State of New York, or the United States acting within the scope of such person's official duties." N.Y.C. Admin. Code § 10-1007(c). But disclaiming a limitation on authority is not the same as granting a right to sue. *See United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 303 (1972) (concluding that a statute providing "[n]othing contained in this chapter . . . shall limit the constitutional power of the President to take such measures as he deems necessary to protect [national security]" doubtlessly "confers no power, as the language is wholly inappropriate for such a purpose"). Put another way, the provision indicates that the City Act does not limit the exercise of *vested* authority. But, as explained above, the City Act does *not* vest the OAG with *any* authority, so Section 10-1007(c) cannot and does not preserve a power that does not exist.

The majority considers none of these bedrock principles of statutory construction. Instead, it looks to 42 U.S.C. §§ 1983 and 1985 and cases discussing *those* statutes. But they bear little resemblance to the City Act, and the cases cited

8

by the majority are inapposite.[5]  While both Sections 1983 and 1985 contain broad language as to who is protected by those statutes—both refer to "the party [so] injured," 42 U.S.C. §§ 1983, 1985(3)—neither defines those terms as the City Act defines "person."  Simply put, the breadth of an undefined term in federal civil rights statutes reveals nothing about how properly to interpret a *defined* term in a City's municipal code.  And even in the context of federal statutes, the Supreme Court has recently cautioned against the majority's unrestricted reading of clauses that confer a right to sue.  *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176 (2011) (referring to a prior statement that the phrase "person aggrieved" "conferred a right to sue on all who satisfied Article III standing" as "ill-considered" "dictum"); *cf. Lexmark Int'l, Inc.*, 572 U.S. at 129–32 (reading statute that authorizes suit by "any person who believes that he or she is likely to be damaged by" false advertising to extend only to those who have suffered "an

---

[5] *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982), speaks in general terms about *parens patriae* standing and its common law elements.  It does not consider when a statute authorizes suit by a government entity nor does it discuss 42 U.S.C. § 1983, as the majority claims.  Moreover, the Commonwealth of Puerto Rico, the plaintiff in *Snapp*, "participate[d] directly in the operation of the federal employment scheme" it challenged.  458 U.S. at 610.  The OAG plays no comparable role in the operation of the City Act.

injury to a commercial interest in reputation or sales") (quoting 15 U.S.C. § 1125(a)(1)).

In sum, the majority errs in disregarding the City Act's text, its structure, and the tools that traditionally guide statutory interpretation. It relies on inapposite authority and reaches the wrong result. I conclude that the OAG may not sue to enforce the City Act and would direct the dismissal of its claims pursuant to that Act on this basis. I do not further address those claims here. [6]

## II. The Clinic Escort Recaps

I now turn to the OAG's appeal and, at the start, to the majority's conclusion that the district court's determination not to grant preliminary relief must be

---

[6] The concurrence suggests that I should want to certify the question of whether the State may sue under the City Act because it would be better "if we had a clearer understanding of what the City Act permits." Concurring Op. 4. But I do not find certification necessary. And contrary to the concurrence's assertion that I "rel[y] on federal court interpretations of federal statutes" to reach my conclusion that the OAG does not have a cause of action under the City Act, Concurring Op. 1, it is only the majority that relies on such interpretations. I merely apply the traditional canons of statutory interpretation, tools that are not unique to federal judges. *See, e.g., Avella v. City of New York*, 29 N.Y.3d 425, 343 58 N.Y.S.3d 236, 241 (2017) (applying the "fundamental rules of statutory interpretation" and noting that "when interpretating a statute, our primary consideration is to discern and give effect to the Legislature's intention. The text of a statute is the clearest indicator of such legislative intent . . . ."). Based on my review of the City Act's text, the State may not sue under the Act. And to the extent the concurrence suggests that the answer to this question is uncertain, it is unclear why the concurrence joins a majority opinion that holds otherwise while at the same time suggesting that a supposed failure to certify lies with the *dissent*.

10

vacated on the ground that the district court erred in declining to afford weight to so-called "Clinic Escort Recaps" ("Recaps") submitted by the OAG. These Recaps, as the district court explained, are "feedback forms" completed by the volunteer escorts and escort leaders "during a debriefing held inside Choices each Saturday after the protestors leave." *Griepp*, 2018 WL 3518527, at *5. They constitute hearsay, not fitting within any exception. The district court, after hearing testimony from seventeen witnesses and considering voluminous videotape, determined, *inter alia*, that relying on the Recaps for their truth was problematic because nothing in the circumstances surrounding their creation suggests reliability but, to the contrary, "they tend to exaggerate the impropriety of protestor conduct and generally fail to provide the context of the interactions they describe." *Id.* at *5; *see id.* at *5–*6. The majority rebukes the district court, concluding that it was required to afford the Recaps weight, despite its unrefuted determination that this evidence is unreliable. [7] Maj. Op. 19–20. This is

_____

[7] The district court judge heard live testimony from several individuals who, by virtue of their positions, would have been involved in the creation and retention of Recaps. These include Pearl Brady, a volunteer escort; Mary Lou Greenberg, an independent contractor directing the volunteer escort program; Margot Garnick, an escort leader; and Theresa White, also an escort leader. *Griepp*, 2018 WL 3518527, at *6–7. The district court determined that none of these witnesses could be deemed wholly credible and that each offered testimony that "prove[d] to be biased and unreliable." *Id.* The majority does not disturb these credibility judgments on appeal, but endeavors to

11

incorrect, as a matter of law. It is also an unwarranted intrusion by appellate judges on the role of the district court judge as fact finder in adjudicating the propriety of preliminary relief.

This Court's decision in *Mullins* does not say what the majority would have it say. Not even close. *Mullins* merely holds that a district court *may* rely on inadmissible hearsay in the context of a preliminary injunction proceeding, not that it *must*. *See Mullins*, 626 F.3d at 52 ("[H]earsay evidence *may* be considered by a district court in determining whether to grant a preliminary injunction." (emphasis added)). And specifically, we explained in *Mullins* that our permissive approach to such evidence at preliminary injunction hearings is rooted in "the summary nature of the remedy" sought and the necessity of "provid[ing] timely provisional relief." *Id.*; *see also id.* at 51–52 ("The Supreme Court has observed that the decision of whether to award preliminary injunctive relief is often based on 'procedures that are less formal and evidence that is less complete than in a trial on the merits.'" (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). Other circuits have likewise emphasized that "the facts and

---

render them beside the point by dictating that the district court afford weight to rank hearsay emanating from the very group from which these in-court witnesses derived. *Id.* For the reasons stated herein, however, this directive is without legal basis.

12

circumstances of a given case," *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 719 (3d Cir. 2004), "including the need for expedition," *Asseo v. Pan Am. Grain Co., Inc.*, 805 F.2d 23, 26 (1st Cir. 1986), inform how much weight, *if any*, to accord hearsay evidence at the preliminary injunction stage—evidence, to be clear, which could not even be considered in a trial on the merits.

In accord with this well-established precedent, the district court considered the "Recaps," prepared by the escorts, and concluded that this unreliable hearsay should not be afforded weight in the present case both because it was unreliable and because there was no need to consider it: "[T]he parties have already conducted discovery and presented extensive live testimony from seventeen different witnesses. That is, the preliminary injunction hearing was hardly 'preliminary,' and that fact remove[d] the urgency usually supporting the use of hearsay testimony in this setting." *Griepp*, 2018 WL 3518527, at *5; *see also id.* at *1 (acknowledging that hearing, originally slated to be an expedited trial, was "[re]styled as a preliminary injunction hearing since the case could not be fully resolved"). I see no abuse of discretion in the district court's decision to focus on more reliable evidence that would be admissible at a trial—videos, photographs,

and live testimony—rather than the secondhand statements of unknown or non-testifying escorts.[8]

Finally, even if there were error here—and there is not—the majority errs yet again by failing to recognize that any error of the sort that it discerns "did not substantially influence" the outcome of the proceeding and is thus utterly harmless. *Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010) (quotation marks omitted). The Recaps were largely cumulative of the in-court testimony of escorts and escort leaders—testimony that the district court found to contain "biased and unreliable" inaccuracies. *Griepp*, 2018 WL 3518527, at *6–7; *see also United States v. Hendricks*, 921 F.3d 320, 330 (2d Cir. 2019) (suggesting that cumulative evidence rarely impacts outcome). Indeed, the OAG concedes that *every* incident described in the Recaps was described in witness testimony at the hearing.[9] *See* AG Supp. Ltr. Br. 7 & nn.3–5, Doc. No. 298 (filed May 11, 2020).

---

[8] The majority relies on *Bradford Trust Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 805 F.2d 49 (2d Cir. 1986), for the proposition that giving no weight to hearsay evidence is error. But *Bradford Trust* involved a court that accorded no weight to a document admitted at a bench trial because it contained hearsay *even though* it fell within a hearsay exception. *Id.* at 55. We explained that such disregard was "inconsistent with the notion of having exceptions to the hearsay rule." *Id.* The Recaps, however, would not be admissible for their truth at a trial. Yet the majority asserts that the district court was *required* to accord them weight. *Bradford Trust* does not support this startling proposition.

[9] *Compare, e.g.,* App'x 431 (escort testifying that a protester "crashed into [an

14

And to the limited extent that the Recaps did not *repeat* in-court testimony, they contradicted it—hardly a reason to force the district court judge to credit these out-of-court statements.[10]

In sum, and contrary to the majority, I see no reason why, having disbelieved live testimony, the district court was nevertheless obligated to afford weight to hearsay versions of the same thing—evidence that fell within no hearsay exception, and could not be admitted in support of a permanent injunction at trial. The majority errs in rejecting the meticulous and careful fact finding of the district

---

escort] shoulder-checking her, or just about knocked her over") *with* App'x 2265 (Recap describing same incident where protester "slam[med] into [an escort] . . . with his shoulder"); *compare* App'x 1262 (escort testifying that protester "was following a patient . . . so closely behind that she actually stepped on the patient's shoe causing it to break") *with* App'x 2321 (Recap describing protester "follow[ing] [patient] . . . so close that she stepped on the back of the woman's flip flop, which broke the strap"); *compare* App'x 551 (escort testifying that a protester "ran a couple into the street" in effort to avoid protestor) *with* App'x 2259 (Recap stating that protester "ran a couple into the street" in effort to avoid protestor).

[10] Certain Recaps directly contradict escort testimony. *See, e.g.*, *Griepp*, 2018 WL 3518527, at *5 ("For example, one Clinic Escort Recap includes the following statement: 'Mary Lou [Greenberg] called [the police] at 8:10 after being shoved by Ron [George] and Griepp.' But, at the preliminary injunction hearing, Greenberg explained that neither R. George nor Griepp actually shoved her." (citation omitted)); *compare* App'x 2250 (Recap indicating that a protester "knocked into [a] woman's child") *with* App'x 1435 (escort testimony admitting that protester "came very close but didn't step on the child"). But these contradictions, considered in context, only further buttress the district court's twin determinations that the escorts offered flawed testimony *and* that the Recaps were unreliable, thus supporting the district court's decision not to issue an injunction.

15

court. It errs, as well, in its understanding of *Mullen* and the appropriate role of appellate courts, which does not include directing district courts that they must give weight to inadmissible and unreliable hearsay in determining whether to afford preliminary relief.

### III. Likelihood of Success on the Merits

I next turn to my disagreement with the majority's conclusions, at odds with the district court's, that: (1) the videotapes marked as Exhibits 138, 23, 307, and 119, as well as 58, 105, and 137, demonstrate physical obstruction; and (2) various statements by Ranville Thomas, discussed herein, constituted true threats for which he may be held liable pursuant to FACE and the State Act. Simply put, the majority misconstrues both the statutes and relevant precedent in suggesting that this evidence forms a basis for preliminary relief. The majority's approach to FACE and the State Act, moreover, gives short shrift to the First Amendment rights of the protestors, notwithstanding this Court's admonition that we are to be "mindful . . . of the fact" that the erroneous application of statutes such as these "threatens to impinge legitimate First Amendment activity." *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 195 (2d Cir. 2001). Guided by the statutory text, precedent, and the district court's factual findings, I would hold that

16

the district court did not abuse its discretion in determining that none of the cited material demonstrates a likelihood of success on the merits.

## A. Physical Obstruction

As relevant to physical obstruction, a person violates FACE and the State Act when, "by physical obstruction," he or she "intentionally injures, intimidates, or interferes with" another person (or attempts to do so) "because that person is or has been . . . obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1) (emphasis added); *see also* N.Y. Penal Law § 240.70(3)(c). Both statutes define "physical obstruction" as "rendering *impassable* ingress to or egress from a facility that provides reproductive health services . . . , or rendering passage to or from such a facility . . . *unreasonably difficult or hazardous*." 18 U.S.C. § 248(e)(4) (emphases added); *see also* N.Y. Penal Law § 240.70(3)(d).

Notwithstanding the clarity of this statutory language, drafted to prohibit "illegal interference with clinic access," but not to stifle "legitimate protest activities," *Operation Rescue*, 273 F.3d at 195, the majority suggests that FACE (and the almost identically worded State Act) are violated by, *inter alia*, "delaying patients even for a brief amount of time" to offer a pamphlet, standing on a sidewalk holding a sign in an area where no clinic visitors are to be found, and by

17

"touching or leaning into the windows and doors of cars," even for a *consensual* conversation. Maj. Op. 61. The majority thus gives short shrift to the requirement that a defendant's conduct render clinic access, at a minimum, "unreasonably difficult or hazardous." And it simply omits the specific intent element from these two statutes, opining that the intent element is satisfied whenever a defendant intends to perform an act (such as providing someone a pamphlet or standing on the sidewalk with a sign) and is aware that the "natural[] and probabl[e]" consequence of this action may be to delay clinic access in even the most incidental of ways.[11] *See* Maj. Op. 35–36.

Simply put, this is an abandonment, not an interpretation, of the statutory language. To be clear, there *are* statutes that proscribe protest activities around abortion clinics pursuant to which even a *de minimis* amount of contact with patients or providers might constitute a violation. *See, e.g.*, *Hill v. Colorado*, 530 U.S. 703, 707 (2000) (upholding Colorado statute that "regulates speech-related

---

[11] As noted *supra* in footnote 3, this is incorrect. As numerous courts have held, FACE "is a *specific intent* statute." *Norton*, 298 F.3d at 554 (emphasis added); *see also Mahoney*, 247 F.3d at 283–84 (noting "requisite specific intent" required for liability). Both FACE and the State Act require a specific intent to "injure[], intimidate[], or interfere[] with" an individual because that individual is or has been "obtaining or providing reproductive services." 18 U.S.C. § 248(a)(1); N.Y. Penal Law § 240.70(1)(a). The majority can cite no contrary precedent.

conduct within 100 feet of the entrance to any health care facility" by prohibiting any person "to 'knowingly approach' within eight feet of another person, without that person's consent, 'for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person'") (quoting Colo. Rev. Stat. § 18-9-122(3) (1999)); *see also Price v. City of Chicago*, 915 F.3d 1107, 1109 (7th Cir. 2019) (discussing Chicago ordinance prohibiting "'sidewalk counselors" from "approaching within eight feet of a person in the vicinity of an abortion clinic if their purpose is to engage in counseling, education, leafletting, handbilling, or protest"). But FACE and the State Act are not among these "buffer zone" or "bubble zone" laws.[12] Notably, moreover, the Supreme Court has recognized such laws to "impose[] an especially significant First Amendment burden" on traditional forms of expression such as "normal conversation and leafletting on a public sidewalk." *McCullen v. Coakley*, 573 U.S. 464, 488–89 (2014). The Court has emphasized that such laws are

---

[12] Indeed, as to the State Act, the New York Legislature has repeatedly considered a bill that would impose a twenty-five foot buffer zone around clinics providing reproductive services, but the bill has yet to move past the "in Committee" phase in the five times it has been introduced since 2011. *See* Proposed Legislation to Amend the Penal Law and the Civil Rights Law, in Relation to Enacting the Reproductive Health Care Facilities Access Act, Assemb. A804, 2019–2020 Leg., Reg. Sess. (N.Y. 2019)

constitutionally infirm when they fail to meet the requirement of narrow tailoring precisely because they "unnecessarily sweep[] in innocent individuals and their speech" and "exclude [them] from areas historically open for speech and debate." *Id.* at 493, 494.

The majority's ill-conceived interpretation of FACE and the State Act as relates to physical obstruction in effect converts these statutes into "buffer zone" equivalents, thereby threatening the ongoing suppression of legitimate First Amendment activity. Indeed, if the majority's interpretation of these two statutes were correct (and it is not), these laws would most probably be unconstitutional. To more concretely demonstrate *why* this is so, I now turn to each of the exhibits the majority takes to evince obstruction.

### 1. Exhibit 138

The district court accurately summarized the conduct depicted in Exhibit 138, a videotape, as follows:

> [Osayinwense] Okuonghae directly approached a patient and her companion in an attempt to speak with the patient and hand her a pamphlet. The patient and companion turned slightly and, *without slowing their pace*, walked around Okuonghae and on to the Clinic door. *Okuonghae made no effort whatsoever to prevent the patient and her companion from walking past him.*

20

*Griepp*, 2018 WL 3518527, at *18 (emphases added) (citations omitted). Okuonghae delayed the patient "by one second, at most." *Id.* at *44.

The majority does not suggest that this description of the facts is clearly erroneous.[13] Rather, it claims the district court committed legal error by assuming as a matter of law that an incidental delay is insufficient to "render[] passage to or from [the] facility . . . unreasonably difficult or hazardous." In the majority's view, "[t]hat patients were delayed at all is sufficient to establish a violation" by physical obstruction. Maj. Op. 40. But the district court did *not* conclude as a matter of law that physical obstruction resulting in a short delay can *never* render access to a facility "unreasonably difficult or hazardous." The court concluded simply that Okuonghae "made no effort to interfere with [the patient and her companion's] progress toward the clinic" and that the videotape reflects *no physical obstruction*. *Griepp*, 2018 WL 3518527, at *44. The degree of delay—

---

[13] Indeed, it is the majority's description, not the district court's, which diverges from the uncontroverted evidence. Contrary to the majority's suggestion, there were not "two to three dozen escorts and protesters . . . on the modestly sized sidewalk" when Okuonghae attempted to hand this patient a pamphlet. Maj. Op. 41. The video shows three protesters, besides Okuonghae, scattered about the sixteen-foot wide sidewalk: two of them stand near the curb and the third trails some distance behind the patient and her companion. None ever impede the patient's path to the door and at all times there remains a stretch of unobstructed sidewalk at least a few feet wide between the patient and the clinic entrance.

21

"one second, at most"—simply informed the district court's analysis but was in no way dispositive. *Id.*

Moreover, even if the district court *had* held that a one second delay is *per se* not a violation of the statute, its interpretation would have been considerably closer to the mark than the majority's conclusion that it is sufficient "[t]hat patients were delayed at all . . . to establish a violation." Maj. Op. 40. Physical obstruction is defined in the statutes, in relevant part, as "rendering passage to or from" Choices "unreasonably difficult or hazardous," 18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d), a definition requiring substantially more than the less-than-one-second delay resulting from an encounter with a pamphleteer who does not seek in any way to block a person's forward movement. And, again, the majority's approach omits the statutes' specific intent requirement—a requirement that is not satisfied upon proof of merely the *de minimis* contact involved in endeavoring to hand someone a pamphlet as that individual walks by.

Compare *Operation Rescue*, in which this Court concluded that the district court there did not abuse its discretion in finding "that the plaintiffs [would likely] carry their burden in demonstrating that [the protester] physically obstructed patient access to covered facilities." 273 F.3d at 195. In that case, "the record

22

[was] replete" with evidence of the protestor's obstructive conduct including, *inter alia*, obstructing driveway access into the clinic parking lot, using her body to slow moving cars, and blocking patients inside their automobiles to prevent exit. *Id.* But even in the context of such "egregious conduct," *Operation Rescue* cautioned against using "the rubric of 'constructive obstruction,' an uncertain and potentially slippery concept," to characterize legitimate protest activities (such as imploring persons not to go inside or, as here, attempting to hand them pamphlets), as illegal interference. *See id.*

But this is precisely what the majority does, with its determination that any delay "is sufficient to establish a violation." Maj. Op. 40. In effect, the majority creates a "buffer zone" equivalent with its disregard of the statutory language, but one lacking any indicia of narrow tailoring, such as a delineated geographical space in which it is to apply.[14] *See Hill*, 530 U.S. at 730 (noting that the "8 foot

---

[14] The majority seeks to avoid this conclusion by suggesting, incorrectly, that my criticism of its approach is limited to the statutes' intent requirement, and that even if a protester's conduct cannot be said to evince an intent to injure or intimidate, the conduct recounted herein could suggest an intent to interfere. Maj. Op. 59–60. But these statutes, as already recounted, provide that a person violates them when, "*by physical obstruction*," he or she "intentionally injures, intimidates, or interferes with" another person "because that person is or has been . . . obtaining or providing reproductive health services." *See, e.g.*, 18 U.S.C. § 248(a)(1)(emphasis added). And both define "physical obstruction," in relevant part, as rendering passage to or from a facility "unreasonably difficult or hazardous." 18 U.S.C. § 248(e)(4); N.Y. Penal Law §

23

[buffer zone] restriction occurs only within 100 feet of a health care facility—the place where the restriction is most needed"). This is the very result that *Operation Rescue* warned of in this context: namely, that ill-conceived approaches to statutory interpretation might lead not simply to legal error, but to the court-sanctioned curtailment of legitimate First Amendment activity. 273 F.3d at 195. Indeed, if the majority's interpretation of these statutes were correct (and it is not) they would likely be unconstitutional as "burden[ing] more speech than necessary to serve the relevant governmental interests." *See Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 367, 379–80 (1997) (striking down an injunction that instituted "floating buffer zones" to prohibit "demonstrating . . . within fifteen feet of any person or vehicle seeking access to or leaving such facilities" because "lack of certainty" of how to comply would "burden more speech than necessary to serve the relevant governmental interests" (internal quotation marks omitted)); *see also McCullen*, 573 U.S. at 488 (striking down buffer zone that "made it substantially more difficult for petitioners to distribute literature to arriving patients"); *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 774 (1994) (noting that "it

---

240.70(3)(d). Okuonghae's *de minimis* interference with clinic access (which was no interference at all) simply does not comport with this statutory definition.

24

is difficult, indeed, to justify a prohibition on all uninvited approaches of persons seeking the services of [a] clinic, regardless of how peaceful contact may be, without burdening more speech than necessary to prevent intimidation and ensure access to the clinic" (emphasis omitted)). In sum, nothing in Exhibit 138 establishes a likelihood of success on the merits, if these statutes are properly construed. The majority errs in concluding otherwise.

### 2. Exhibit 23

The majority's reasoning does not improve in its consideration of Exhibit 23. Exhibit 23 depicts an individual approaching Choices accompanied by two escorts. *Griepp*, 2018 WL 3518527, at *18. In the district court's words:

> It also shows Okuonghae . . . standing near [the] main entrance and then approaching the patient and her escorts from that direction. As they approach, it appears that [a third escort] is in the patient's path and Okuonghae is off to the side, reaching out his arm in an attempt to hand her a pamphlet. [The escort] then moves out of the way as the patient's two escorts step in front of her and motion for Okuonghae to get even further out of the way. The entire interaction slows the patient's access to Choices by perhaps a second.

*Id.* The majority concedes that this video shows "an *escort* that stepped in front of the patient." Maj. Op. 45 (emphasis added). Nevertheless, the majority concludes that Okuonghae may be held liable for obstructing the patient's path

25

because he "[c]rowd[ed]" the patient and "thereby creat[ed] a logjam in which others inadvertently impede [her]." *Id.* at 45.

The majority is wrong both on the facts and on the law. On the facts, and as the district court explained, Okuonghae stayed off to the side and was the only protester who approached the individual on her way into the clinic. On the other hand, she was flanked by two escorts while a third stepped into her path to block Okuonghae from handing her a pamphlet, which is what "create[d] a logjam." Okuonghae merely approached her, arm outstretched, in the hopes of handing her a pamphlet while staying out of her way. Indeed, when asked, he moved away even further. *See McCullen*, 573 U.S. at 467 ("[T]o determine whether someone intends to block access to a clinic, a police officer need only order him to move; if he refuses, then there is no question that his continued conduct is knowing or intentional.").

The majority gives lip service to the proposition that "[s]imply attempting to speak with or hand pamphlets to patients, without more, does not give rise to a FACE violation." Maj. Op. 53. But the majority, in effect, bars this activity at Choices by suggesting that the something "more" that is required includes even a *de minimis* delay in a client's forward motion caused by *escorts'* efforts to prevent

26

any pamphlet from being received. In other words, any act by a protester—including reaching out, pamphlet in hand—obstructs access to a clinic so long as the *clinic's* employees or volunteers react to that act by crowding around, even momentarily slowing the visitor down. This is not consistent with the statutory language. And it is indefensible in light of the Supreme Court's recognition, in *McCullen*, that "'[n]o form of speech is entitled to greater constitutional protection'" than the handing out of leaflets on a public sidewalk, and that it is simply "wrong to downplay" burdens on speech in this "especially significant" First Amendment context. 573 U.S. at 488, 489 (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995)); *see also Schenck*, 519 U.S. at 377 ("Leafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment, and speech in public areas is at its most protected on public sidewalks, a prototypical example of a traditional public forum.").

### 3. Exhibit 307

A similar error infects the majority's assessment of Exhibit 307. The district court described Exhibit 307 as follows:

> Exhibit 307 shows that, on the morning of March 25, 2017, a patient's access to the Clinic door was accidentally and briefly impeded, but not by [the defendant Ronald] George. At the beginning of the incident, R. George reached the patient first and handed the patient a

27

pamphlet, which she took. Two escorts soon reached the patient and attempted to position themselves on each side of her, with one escort stepping in front of R. George and slowing his pace, forcing R. George to step around the escort to access the patient and continue his attempts to engage her in conversation. As R. George did so, the escort on the far side of the patient stepped partially and then completely in front of her in an attempt to block R. George's access to her. This momentarily blocked the patient's path to the Clinic entrance, causing her to slow down and then walk around the other side of the escort standing in front of her. From there, the patient walked to the door without impediment.

*Griepp*, 2018 WL 3518527, at *11 (citations omitted).[15]

The majority rejects this "interpretation of the video" as clearly erroneous. Maj. Op. 51. In the majority's view, "R. George actively stepped around the escort to access the patient . . . [and] walk[ed] directly in front of the patient . . . . As a result, both the patient and the escort slowed to a near stop, and the patient then walked around the other side of both escorts and continued into the clinic." *Id*. A careful review of Exhibit 307, however, demonstrates that R. George only briefly stepped in front of the patient while circumnavigating the escort who had stepped in front of him, but R. George largely remained to the side of the patient's path. Indeed, the only person who ever fully blocks the patient's path is an

---

[15] To avoid confusion between the two defendants with the same last name, Ronald George and Brian George, the district court referred to them as R. George and B. George, respectively. I do the same here, where helpful for clarity's sake.

28

escort, not R. George. And the patient "change[d] course," *id.* at 52, not because of R. George's momentary presence in her path, but because an escort stepped squarely in front of her.

Under the circumstances, the district court's conclusion that R. George did not render the patient's access to the Clinic unreasonably difficult or hazardous, as the statutory language requires, is not clearly erroneous. Even if reasonable minds could differ on what caused the patient to "change [her] course," *see id.*, the majority thus has no basis for substituting its judgment for that of the district court's. Nor does the majority offer any grounds for setting aside the district court's additional finding that R. George lacked the requisite intent of "injur[ing], intimidat[ing], or interfer[ing] with" the individual, a required element pursuant to these statutes. *See* 18 U.S.C. § 248(e)(4); N.Y. Penal Law § 240.70(3)(d). There is nothing in Exhibit 307 demonstrating that R. George intentionally obstructed any individual's access to Choices. The majority's rejection of the district court's fact finding as clearly erroneous is thus without factual or legal support.

### 4. Exhibit 119

The majority's analysis of Exhibit 119, a photograph, illustrates yet again its distortion of the statutory language—a distortion that, in effect, transforms most

29

*any* effort to engage in legitimate protest activity outside Choices into a physical obstruction, violative of FACE and the State Act. The district court's fact finding as to Exhibit 119 was careful and amply supported. The majority's rejection of it as clearly erroneous is, as before, utterly inexplicable.

The district court correctly determined that Exhibit 119 does not depict the defendant, Patricia Musco, either "intentionally or even accidentally obstruct[ing] access to Choices." Instead, it "shows Musco narrowing the sidewalk by holding two signs perpendicular to [a] Clinic wall." *Griepp*, 2018 WL 3518527, at *12. To be sure, signs *could* be used to block people from accessing a facility. Here, however, Musco simply positioned her signs so as to "narrow[] the low-traffic portion of the sidewalk to the south of the Clinic entrance, facing her sign[s] north." *Id.* (citation omitted). The district court determined that Musco was holding her signs so as to be visible to the vast majority of clinic visitors, approaching from the north, "all of whom would reach the Clinic door without [even] passing Musco." *Id.* The district court concluded that "because the photo does not show any patients approaching, and because patients rarely approach[] Choices' main entrance from the south," "one could not infer that

30

Musco's positioning in this picture made access to Choices unreasonably difficult for any patient." *Id.* (citation omitted).

Somehow, the majority disagrees. The majority infers from the fact that "Musco's signs . . . significantly shortened the space available for walking" that Musco "was []aware that her signs would interfere with pedestrian access," even though there are no pedestrians depicted in Exhibit 119 to be the subject of any such interference. Maj. Op. 43. Moreover, Exhibit 119 shows several feet of open sidewalk unobstructed by Musco's signs.[16] The majority thus provides no basis for rejecting the district court's factual findings that Musco neither obstructed passage nor intended to do so. These findings were in no way implausible, let alone clearly erroneous. *See, e.g.*, App'x 1830 (testimony of Pat Musco) (responding that it was "never" her "intent to intimidate a person out of entering the clinic" or "ever to block a person's access to the clinic").

Instead, it is the majority's view of the record that cannot be supported. Exhibit 119 depicts Musco holding up signs on a public sidewalk, which is

---

[16] In addition, the district court concluded that the record shows that the protestors here sought to avoid unlawful conduct, *Griepp*, 2018 WL 3518527, at *33, and Kenneth Griepp, a leader of the protesters who, like Musco, are affiliated with Church at the Rock, testified that he told protesters to "move [their] sign[s] to the side" to avoid "slowing [pedestrians] down" when pedestrians appeared. App'x 1739.

31

quintessential First Amendment activity. *See Marcavage v. City of New York*, 689 F.3d 98, 104 (2d Cir. 2012). Yet the majority concludes that this photograph evidences unlawful obstruction, rendering a preliminary injunction appropriate, even though there were no pedestrians around to be obstructed and Musco's placement of her signs still left open approximately one-third of a rarely-trafficked sidewalk that is over sixteen feet wide. *See* App'x 2878 (showing sidewalk dimensions). This is not abuse of discretion review, but the distortion of the record to "characterize[] legitimate protest activities as illegal interference with clinic access," *Operation Rescue*, 273 F.3d at 195, suppressing First Amendment rights.

### 5.   **Exhibits 58, 105, and 137 (Conduct Involving Vehicles)**

Conduct that on the sidewalk might not interfere substantially with ingress and egress from a facility may do so in the context of automobiles, simply by virtue of the special circumstances they present. It can be hazardous for both a protestor and a car's occupants when the protestor sticks his hand through the window of a vehicle as it moves away or stands in such a manner that a car door cannot close and the vehicle cannot depart. We have recognized as much by holding that "using [one's] body to slow moving cars and pushing literature and pamphlets

32

through car windows" can amount to physical obstruction that renders access to or departure from a clinic unreasonably difficult or hazardous. *Operation Rescue*, 273 F.3d at 195. To the extent the majority merely reiterates this proposition, I agree. *See* Maj. Op. 47.

But the majority, again, goes further and gets it wrong. The district court found based on a review of Exhibits 58, 105, and 137, all videotapes, that none involved physical obstruction. In Exhibit 58, as recounted by the district court, Okuonghae "lean[s] beside and speak[s] into an open car window," and "[t]he video does not suggest a non-consensual interaction—let alone that Okuonghae obstructed access to or from the Clinic." *Griepp*, 2018 WL 3518527, at *18. The district court similarly concluded that Exhibit 105 does not "suggest [a] non-consensual interaction[]."[17] *Id.* at *12. Finally, Exhibit 137 depicts *Greenberg*, the director of the volunteer escort program, speaking to the passenger of a parked

---

[17] The majority inexplicably imposes its own interpretation of the video, deciding that because Musco is seen "physically leaning onto the passenger door, resting her purse and hands on the passenger window frame," the interaction was not consensual. Maj. Op. 48–49. But Exhibit 105, a short video, lacks any context to support this conclusion. Exhibit 49B, which both the district court and the majority appear to confuse with Exhibit 105, does show Musco approaching the car at issue. But far from suggesting that the encounter was not consensual, this video suggests that Musco approached the vehicle simply to hand the driver a pamphlet after the patient had exited the car and entered Choices.

33

car. After Greenberg "effectively shepherd[s]" this person "from the car to the entrance without impediment from the protestors or anyone else," Thomas, a protestor, steps up to the open car door "and lean[s] down to speak to the driver." *Id.* at *15. As the district court accurately describes, "[a] minute later, Thomas close[s] the car door for the driver, and then continue[s] to speak with the driver through the window for another minute and a half before the car [drives] off without impediment." *Id.* In sum, the district court examined the relevant videos and concluded that as to each incident, the OAG had "failed to provide credible evidence that the defendants . . . engaged in any . . . obstructive conduct." *Id.* at 43.

The majority rejects this careful fact-finding, claiming that "our precedent" compels the conclusion that each exhibit evidences statutory violations. Maj. Op. 47. It does so, however, only by adopting a novel rule that consent is immaterial under the statutes—in effect, that even if a car's occupants willingly agree to speak with a protestor outside of a facility, the statutes are still violated because a protestor's "conduct in touching the car[]" makes "egress unreasonably difficult or hazardous," and also "restrict[s] the car['s] freedom of movement." *Id.* at 50; *see id.* at 49 ("There is no statutory exception for consensual conversations."). But

34

this distorts the statutory language beyond recognition. These statutes, in relevant part, prohibit individuals, by physical obstruction, from "intentionally injur[ing], intimidat[ing] or interfer[ing] with . . . any person because that person is or has been . . . obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1); *see also* N.Y. Penal Law § 240.70(1)(a). A protester who has only *consensual* conversations with a car's occupants (and in at least Exhibit 157, the car's driver and not the "person . . . obtaining or providing health services") is not acting with an intent to injure, intimidate, or interfere, and has not rendered access to or from a clinic "unreasonably difficult or dangerous." In holding otherwise, the majority departs from the statutory language, once again without regard to the outright suppression of legitimate First Amendment activity.

## B. Threats of Force

FACE and the State Act also penalize, in relevant part, those who, "*by threat of force*," intentionally injure, intimidate, or interfere with a person (or attempt to do the same) "because that person is or has been . . . obtaining or providing reproductive health services." 18 U.S.C. § 248(a)(1) (emphasis added); *see also* N.Y. Penal Law § 240.70(1)(a)-(b). But only statements proscribed as "true threats" under the First Amendment give rise to liability under these provisions.

35

*See Operation Rescue*, 273 F.3d at 196–97. The majority concludes that the OAG established a probability of success on the merits because Ranville Thomas supposedly violated this provision on three separate occasions by issuing "true threats." Again, however, it reaches this conclusion only by unjustifiably rejecting the district court's careful fact-finding.

Thomas, who testified during the course of the fourteen-day hearing, is affiliated with the Church at the Rock and, at the time of the hearing, had protested outside Choices on Saturday mornings for some six years, along with other individuals associated with that church. The district court noted that Thomas "regularly preached about the fragility of life and the need to repent and accept God as one's savior." *Griepp*, 2018 WL 3518527, at *35. Indeed, Theresa White, one of the escort leaders who testified at the hearing, affirmed that Thomas said, "[Y]ou never know when you're going to die," whenever "there [was] something violent in the news," or in one instance, after witnessing "a knife fight across the street," suggesting that Thomas's statement was a broader reference to the uncertainty of life. App'x 1580–81. As White put it, this was Thomas's "mantra." *Id.* at 1580. And "[i]t is worthy of note," the district court observed,

36

"that, on the videos introduced into evidence, when Thomas preaches, he never does so in a threatening tone." *Griepp*, 2018 3518527, at *38.

At the hearing, Thomas did not deny making statements to escorts to the effect of "[y]ou never know when you're going to die," "[you] never know when death may come," and that "[you] could die from being shot by a bullet while on the sidewalk." *See id.* at *13–14, *35. Nor did he deny making a comment to Greenberg in the aftermath of the knife fight between two unknown persons across the street from Choices that "[t]hat could be you one day. Someone could pull a knife on you." *Id.*

But Thomas *did* deny threatening either escorts or patients and he testified that his statements about the need for repentance and the unpredictability of death come from the Bible, and were stated in that context. *See* App'x 1878 (testimony of Ranville Thomas) ("I want to be clear, . . . whenever I say a comment . . . I use it in a context. If there's no context, I'm not using [a] phrase [such] as 'you can die at any time.' I would use . . . the book of Hebrews in the Bible, Chapter 9, Verse 27. And it says, 'And it's appointed once for men to die and then comes judgment.' So I would take that phrase and say, you know, this is what the Bible says[.]") (quotation marks and capitalization added). The district court, unlike

this Court, heard this testimony and concluded that "it appears that Thomas made his statements to the escorts about the shortness of life and the randomness of death as part of his religious message and not as threats intending to place the escorts in fear of bodily harm or death." *Griepp*, 2018 WL 3518527, at \*14. The district court further concluded that "[a]fter years sharing the sidewalk," the escorts were familiar with both Thomas and the context of his speech, "and were not genuinely fearful" of him or intimidated by his words. *Id.* at \*35. The district court concluded that none of the challenged statements, considered in context, constituted true threats for which Thomas could be held liable. *Id.* at \*36.

Notwithstanding its lengthy discussion of "true threats," the majority does not explain how it is better positioned than the district court, which had the benefit of hearing from both Thomas and the escorts, to assess whether true threats were ever made. Moreover, in its analysis of the First Amendment's "true threat" doctrine, the majority again runs afoul of *Operation Rescue*. There, we considered several statements made to clinic staff, including "killing babies is no different than killing doctors," "[y]ou won't be laughing when the bomb goes off," and "[y]ou're next, I hope you're next, you're next." 273 F.3d at 196 & n.5. We expressed skepticism that any such statements amounted to "true threats." *Id.* at

38

196.    But compared to the statements in *Operation Rescue*, the statements here are more abstract, passive, and impersonal—in short, they are less threatening.[18]    *Cf. United States v. Turner*, 720 F.3d 411, 423 & n.6 (2d Cir. 2013) (acknowledging that "rigid adherence to the literal meaning of a communication without regard to its reasonable connotations" is improper but declining to hold "that syntax is not a relevant factor for consideration").

The majority points to a "shooting at [a] Planned Parenthood" clinic in Colorado "a few months prior" to some of Thomas's statements to argue that, in context, a true threat was made.    Maj. Op. 69.    But there is no evidence that Thomas was aware of this context when he made these statements.    And even if he were, in *Operation Rescue*, unlike here, the speaker directly referenced a recent

---

[18] The majority considers whether Thomas's statements were "subjectively frightening" to the escorts.    Maj. Op. 70.    But, as the majority acknowledges, the relevant test for whether a statement constitutes a "true threat" is objective.    *See United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013); *Operation Rescue*, 273 F.3d at 196. Moreover, the district court determined as a matter of fact that the escorts were not afraid. And while there is some testimony in the record to the effect that escorts felt the statements were 'threatening and scary,'" Maj. Op. 70 (citing App'x 1203, 2263), there is also escort testimony indicating that they "were not genuinely fearful of [the protesters] or intimidated by their words."    *Griepp*, 2018 WL 3518527, at *35; *see, e.g.*, App'x 1377 (Q: "No one ever told you that they feared Scott Fitchett was going to harm them, did they?" A: "No.").    Moreover, the majority does not challenge the district court's determination that the testimony of the escorts cannot be taken at face value, and was both "biased and unreliable" in significant respects.

violent incident in the same community, and yet we concluded that the statement was an "expression of a political opinion . . . entitled to First Amendment protection." 273 F.3d at 196–97. There, the defendant told a clinic doctor that "killing babies is no different than killing doctors" in the immediate aftermath of the murder of a New York doctor who performed abortions, and in the same judicial district in which the allegedly threatening statements were made. *Id.* at 196 & n.5. But we concluded that this form of expression "went to the core of [the speaker's] protest message" and, in context, was *not* a threat. *Id.* at 196–97. The majority's analysis is thus at odds with *Operation Rescue* and with its recognition that the "dynamic public exchange safeguarded by the First Amendment" requires a wide scope of protection, and even for speech that many might deplore. *Id.* at 195–96.

Nor do the out-of-circuit cases cited by the majority help its position. In each of those cases, the speaker had a pre-existing relationship with or purposely employed similar tactics to someone who had actually *committed* acts of violence. *See United States v. Dillard*, 795 F.3d 1191, 1201, 1203 (10th Cir. 2015) (noting the "Defendant's publicized friendship with, and comments about, the man who had murdered the last doctor to provide abortions in [Wichita]"); *Planned Parenthood of*

40

*the Columbia/Willamette, Inc. v. Am. Coal. of Life Activists*, 290 F.3d 1058, 1062, 1066, 1085 (9th Cir. 2002) (defendant circulated posters in the same style as posters that preceded murder of physicians pictured); *United States v. Hart*, 212 F.3d 1067, 1072 (8th Cir. 2000) (defendant parked trucks near a clinic in a manner "similar[] to the well-known events of the Oklahoma City bombing"). Not so here. Thomas never indicated that he had, nor were the escorts aware of any, relationship with the Colorado Planned Parenthood shooter. And the district court found that "an ordinary, reasonable escort familiar with the preaching and other conduct of Thomas" would not have interpreted his statements as threatening at all. *Griepp*, 2018 WL 3518527, at *36.

The majority likewise errs in rejecting the district court's careful assessment of Thomas's statement to a patient that the escorts "won't be here when you leave." *Id.* at *38. As the district court explained, Thomas regularly preached "that Choices does not care about babies; they just want money."[19] *Id.; see also id.* at *14 n.8 (referring to a recording of Thomas stating, "Please ma'am, they don't care

---

[19] The district court observed, moreover, after viewing the videotapes, that Thomas does not deliver this message in a threatening manner—that "[t]here is nothing about his demeanor that suggests that he is a threat to the patients[.]" *Griepp*, 2018 WL 3518527, at *38.

41

about your children. They don't care about children inside of this place. What they care about is the dollars."); App'x 1842. In the context of statements such as, "Please ma'am, they don't care about your children. . . . What they care about is the dollars," the meaning of the challenged statement becomes clear: Thomas was not threatening a patient with violence in the absence of escorts, but indicating that the escorts and Clinic staff would not be there for the patients in the long run, in contrast to Thomas and his church who "are here . . . [and] willing to assist in any way." *Griepp*, 2018 WL 3518527, at *14 n.9. Based on this context, the district court permissibly concluded that Thomas's statement did not amount to a true threat. *See id.* at *14 ("Thomas's statement could be understood to communicate that, once a patient's procedure is over and her bill is paid, the escorts will no longer be concerned with her well-being."). The majority has no basis for rejecting this sound and well-reasoned determination.

## IV. Irreparable Harm

As already noted, the district court determined that three violations of the relevant statutes did occur. Because they did not specifically deny it during their testimony, the district court found that both Musco and Anne Kaminsky, on a single occasion, violated the City Act by falsely telling a patient and her mother

42

that the Clinic was closed.[20]     The court also determined that B. George, as he admitted, "physically obstruct[ed] patient access to Choices on three occasions by engaging in a deliberate 'slow walk' in front of patients" so as to gain additional time to speak with them.   *Griepp*, 2018 WL 3518527, at *22.     But the district court further determined that even assuming the OAG would likely succeed on the merits as to these three alleged violations, the OAG failed to demonstrate that these violations were likely to recur.   The majority sets aside this conclusion. Again, I disagree.

Where "a district court contemplates imposing an injunction based in part on a past history of illegal behavior by protestors, it should be vigilant to ensure that the current protests threaten to maintain whatever coercive influence resulted from the original illegal conduct."   *Operation Rescue*, 273 F.3d at 200.   Put another way, "a district court's findings should definitively confirm that injunctive relief is necessitated by current and ongoing plans or activities."   *Id*.   Otherwise, we

---

[20] The district court noted that this charge relied entirely on the testimony of Troyd Asmus, a security guard at Choices with "significant credibility problems."   *Griepp*, 2018 WL 3518527, at * 13.   The court deemed it odd that Asmus, who claimed to be within earshot, would not have informed the patient that the facility was, in fact, open.   But "since no evidence [was] offered to rebut" this claim over the course of the fourteen-day hearing, the district court deemed it substantiated.   *Id.* at *19.

have cautioned, courts end up using past conduct "to place a permanent burden on the exercise of First Amendment rights." *Id.* And we have also said it is the district court, not this Court, that "'is best qualified to form a judgment as to the likelihood of a repetition of the offense.'" *United States v. Diapulse Corp.*, 457 F.2d 25, 29 (2d Cir. 1972) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).

Here, the majority sets this precedent aside to substitute its own judgment for that of the district court. Moreover, it completely misreads the two primary precedents upon which it purports to rely: *S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972), and *Commodity Futures Trading Comm'n v. British American Commodity Options Corp.*, 560 F.2d 135 (2d Cir. 1977).

In *Manor Nursing Centers*, we *upheld* a district court's issuance of a *permanent* injunction, noting that a likelihood of future violations may be inferred from past unlawful conduct, where the district court had found the violations to be "willful, blatant, and often completely outrageous." 458 F.2d at 1100–01. Conversely, here, the district court *denied* the motion for a *preliminary* injunction. The abuse of discretion standard thus weighs against overturning the judgment. Moreover, in *Manor Nursing Centers*, the district court "doubt[ed] the veracity of

44

appellants' assurances" that they would not continue to violate federal securities laws.  *Id.* at 1101.   The district court made the exact opposite finding here—that there was simply no "'reasonable likelihood that the wrong will be repeated.'" *Griepp*, 2018 WL 3518527, at *42 (quoting *City of New York v. Golden Feather Smoke Shop, Inc.*, 597 F.3d 155, 120–21 (2d Cir. 2010)).

*British American* is also off the mark.   There, the Commodity Futures Trading Commission ("CFTC") instituted proceedings *after* it "found 'good cause' to deny registration" to British American, a commodity trading advisor.   *British Am.*, 560 F.2d at 141.   Nevertheless, British American continued to operate.   *Id.* We explained that an injunction was appropriate because "Congress ha[d] specifically found that the activities of commodity trading advisors affect substantially the transactions on commodity markets" and, to regulate those markets, had delegated authority to the CFTC to register advisors "upon proper application and scrutiny."   *Id.* at 142.   Because the CFTC had already found good cause to deny British American registration, any subsequent advising was presumptively impermissible.    Yet British American continued to "offer commodity trading advice right up to the day of the hearing in the district court"— that is, after the CFTC denied its application.   *Id.*

45

Conversely, there was no prior determination here that the protesters were violating the law. Instead, the district court found, considering the record as a whole, that these protestors endeavored not to do so. *Griepp*, 2018 WL 3518527, at *33. The majority sees an abuse of discretion in the district court's conclusion that B. George was unlikely to violate the statutes again.[21] But B. George walked slowly in front of patients approaching the Clinic entrance only a few times over years of protest. *See* App'x 1869–70 (testimony of Pat Musco) (noting only "two instances" of B. George slow walking "[b]ack in the middle of 2017"); App'x 2187 (Supplemental Declaration of B. George) (stating that [o]n a handful of occasions in early 2017" he engaged in conduct that "could be seen as blocking or slowing the patients' access into the clinic"). Two of those occasions were in February 2017; the other was on June 3, 2017, weeks before this lawsuit was filed. *Griepp*,

---

[21] As to Musco and Kaminsky, the conduct at issue allegedly violated the City Act, not FACE and the State Act. My conclusion that the OAG may not enforce the City Act means that this conduct, even assuming violation of that Act, provides no basis for an injunction. That said, I see no abuse of discretion in the district court's determination that a one-time violation over many years of Saturday morning protest, and occurring at least ten months prior to the beginning of litigation, was not reasonably likely to recur— instead, that it is unlikely "that either Musco or Kaminsky, having been warned about the impropriety of [their conduct], will tell another patient that the Clinic is closed when it is open." *Griepp*, 2018 WL 3518527, at *48; *see Operation Rescue*, 273 F.3d at 200 ("[A] district court's findings should definitively confirm that injunctive relief is necessitated by current and ongoing plans or activities.").

46

2018 WL 3518527, at *42; *see also* App'x 1869–70. Moreover, as the district court found, B. George *ceased* this conduct when Griepp, the leader of the Church at the Rock protestors, learned of it and told him to do so. *Griepp*, 2018 WL 3518527, at *42. And B. George provided the district court with a sworn declaration that he would not engage in the conduct again. *Id.* at *42; *see also* App'x 2187. Notably, we decide this case in 2021, with no indication before this Court that B. George has reengaged in this conduct since almost *four years* prior.

This case thus bears no resemblance to the precedent on which the majority purports to rely. B. George rarely violated the statute and, once he was put on notice that his conduct might be unlawful, he ceased it entirely. Such facts amply support the district court's conclusion that preliminary relief was unnecessary and would only burden the exercise of First Amendment rights. *See Operation Rescue*, 273 F.3d at 200; *cf. Robert Stigwood Grp. Ltd. v. Hurwitz*, 462 F.2d 910, 912–13 (2d Cir. 1972) ("'[N]o reasonable expectation that the wrong will be repeated'" where it consisted in "a 'one-shot' series of performances which long ago ha[d] come and gone [*i.e.*, six months before the appeal was decided] . . . and there [was] no evidence whatsoever . . .that [the defendant] has planned or is planning other productions anywhere." (quoting *W.T. Grant Co.*, 345 U.S. at 633)). We said in

47

*Operation Rescue* that an injunction in this sensitive First Amendment context should issue when the district court's findings "definitively confirm that injunctive relief is necessitated by current and ongoing plans and activities." 273 F.3d at 200. The district court did not abuse its discretion in concluding that this is simply not the case with regard to the regular Saturday morning protests at Choices.

\*     \*     \*

We warned in *Operation Rescue* that courts must not "characterize[] legitimate protest activities as illegal interference with clinic access." 273 F.3d at 195. We noted that special care must be taken in this context, lest the erroneous application of statutes by courts "impinge legitimate First Amendment activity." *Id.* Some issues invariably inspire great passion. But dearly held beliefs are no excuse for torturing statutory language, abandoning precedent, and jettisoning carefully reasoned and amply supported district court findings, particularly when First Amendment freedoms are at stake. Proper consideration of the law, the facts, and most critically, the deferential abuse of discretion standard, requires a different result than the one reached by the majority here. Accordingly, except

48

as specifically noted herein with regard to those few points on which we agree, I

respectfully dissent.